# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 20, 2007

Charles R. Fulbruge III
Clerk

No. 06-10498

CHAD O'HARA, Individually and as Next Friend of H.O., a
Minor; MICHELLE O'HARA, Individually and as Next Friend of
H.O., a Minor

Plaintiffs-Appellants

v.

GENERAL MOTORS CORPORATION

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY, CLEMENT, and OWEN, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Chad and Michelle O'Hara ("the O'Haras") bring suit against General Motors Corporation ("GM") for injuries sustained by their daughter, H.O., when she was partially ejected from a 2004 Chevrolet Tahoe during a rollover accident. The district court granted summary judgment in favor of GM on the ground that the suit is preempted by Federal Motor Vehicle Safety Standard ("FMVSS") 205. 49 C.F.R. § 571.205. The O'Haras appeal. For the reasons stated below, we reverse in part, affirm in part and remand to the district court.

## I. FACTS AND PROCEEDINGS

H.O., a minor, seriously injured her arm when she was partially ejected from the passenger side window of a Tahoe during a low-speed quarter-rollover accident. The O'Haras sued GM in Texas state court, alleging common law theories of strict liability and negligence for the defective design, manufacture, and marketing of the Tahoe's side windows. The O'Haras claimed that GM's use of tempered glass in the side windows was unreasonably dangerous and that the use of advanced glazing would have decreased the likelihood of passenger ejection.[1] The O'Haras also brought marketing and failure-to-warn claims.

GM removed this action to federal district court based on diversity jurisdiction. GM moved for summary judgment on the ground that FMVSS 205, the federal safety standard for glass used in motor vehicle windows, preempted the O'Haras' claim. In their reply to GM's motion, the O'Haras argued that FMVSS 205 did not preempt their advanced glazing claim. They also claimed that the Tahoe's side windows did not comply with FMVSS 205 as designed and

---

[1] Throughout this opinion, we will use "advanced glazing" to refer to laminated glass and glass-plastic glazing material, the glass options favored by the O'Haras and their experts. The 1996 American National Standard for Safety Glazing Z26.1 [hereinafter ANSI/SAE Z26.1-1996], which is incorporated by reference in FMVSS 205, defines laminated glass, tempered glass, and glass-plastic glazing as follows:

> The term "glass-plastic glazing material" means a laminate of one or more layers of glass and one or more layers of plastic in which a plastic surface of the glazing faces inward when the glazing is mounted in a vehicle.

ANSI/SAE Z26.1-1996 § 1.5.

> The term "laminated glass" means two or more pieces of sheet, plate, or float glass bonded together by an intervening layer or layers of plastic material. It will crack or break under sufficient impact, but the pieces of glass tend to adhere to the plastic. If a hole is produced, the edges are likely to be less jagged than would be the case with ordinary annealed glass.

Id. at § 1.6.

> The term "tempered glass" means a single piece of specially treated sheet, plate, or float glass possessing mechanical strength substantially higher than annealed glass. When broken at any point, the entire piece breaks into small pieces that have relatively dull edges as compared to those of broken pieces of annealed glass.

Id. at § 1.21.

that the tempered glass in the window was defectively installed and implemented. The district court granted GM's motion for summary judgment on the basis of preemption and dismissed the O'Haras' noncompliance and defective design claims sua sponte. O'Hara v. Gen. Motors Corp., No. 3:05-CV-1134, 2006 WL 1094427, at *5–7 (N.D. Tex. Apr. 25, 2006).

A.    FMVSS 205

The glazing standards in FMVSS 205 were promulgated by the National Highway Traffic Safety Administration ("NHTSA") under the Federal Safety Act ("FSA"), 49 U.S.C. § 30101 et seq. The FSA preempts state regulations, 49 U.S.C. § 30103(b), but compliance with a motor safety standard prescribed under the Act does not preempt common law suits, 49 U.S.C. § 30103(e). FMVSS 205 "specifies performance requirements for the types of glazing that may be installed in motor vehicles" and "specifies the vehicle locations in which the various types of glazing may be installed." NHTSA, Glazing Materials, Final Rule, 68 Fed. Reg. 43,964, 43,965 (July 25, 2003) (codified at 49 C.F.R. § 571.205) [hereinafter Glazing Materials Final Rule]. "The purpose of [FMVSS 205] is to reduce injuries resulting from impact to glazing surfaces, to ensure a necessary degree of transparency in motor vehicle windows for driver visibility, and to minimize the possibility of occupants being thrown through the vehicle windows in collisions." 49 C.F.R. § 571.205, S2.

In 2003, following a four-year review process, NHTSA updated FMVSS 205 to incorporate the most recent standards from the American National Standards Institute ("ANSI"), the American National Standard for Safety Glazing Materials Z26.1 [hereinafter ANSI/SAE Z26.1-1996]. Glazing Materials Final Rule, 68 Fed. Reg. at 43,964–65. Under both the old and revised versions of FMVSS 205, tempered glass and laminated glass are approved glazing materials. See ANSI/SAE Z26.1-1996 §§ 3.2 (tempered glass), 3.3 (laminated glass), 3.4 (glass-plastic glazing), incorporated by reference in

49 C.F.R. § 571.205, S3.2(a). Laminated glass is approved for use throughout a vehicle, while tempered glass can be used anywhere other than in the windshield. See ANSI/SAE Z26.1-1996, T. 1 (Items 1 & 2). The ANSI standards also state that "[o]ne safety glazing material may be superior for protection against one type of hazard, whereas another may be superior against another type. . . . [N]o one type of safety glazing material can be shown to possess the maximum degree of safety under all conditions." Id. at § 2.2.

B.    NHTSA's Rollover Accident Research

FMVSS 205 became the focus of NHTSA's rollover protection policy in the early 1990s after Congress mandated that NHTSA initiate rulemaking on rollover protection. NHTSA, Withdrawal of Advance Notices of Proposed Rulemaking, 67 Fed. Reg. 41,365, 41,366 (June 18, 2002) [hereinafter Notice of Withdrawal]. In 1992, NHTSA issued a notice of proposed rulemaking on rollover protection which solicited comments on both rollover prevention measures (such as vehicle stability controls) and occupant ejection prevention strategies (such as advanced glazing). NHTSA, Rollover Prevention, Advance Notice of Proposed Rulemaking, 57 Fed. Reg. 242 (Jan. 3, 1992). Following the 1992 notice of proposed rulemaking, NHTSA chose to focus its rollover protection policy on advanced glazing and issued status reports on its advanced glazing research in 1995 and 1999. Notice of Withdrawal, 67 Fed. Reg. at 41,366.

In 2001, Congress passed the Department of Transportation and Related Agencies Appropriation Act of 2001, which noted that the "NHTSA had been considering the utility of advanced side glazing since 1991" and "directed NHTSA to complete and issue a final report on advanced side glazing." Id. at 41,367 (citing the House of Representatives Conference Report on H.R. 4475). In response, NHTSA withdrew its notice of proposed rulemaking on advanced glazing. Id. NHTSA stated in its Notice of Withdrawal that it declined to require advanced glazing based on "safety and cost concerns." Id. The safety

concerns included NHTSA's desire to establish standards for promising new technologies like side air curtains. Id. NHTSA also noted that the well-established safety benefits of advanced glazing in side windows were not without drawbacks, including a slightly increased risk of minor neck injuries. Id. at 41,366–67. With regard to cost, NHTSA noted that manufacturers disputed its estimate that it would cost between $48 and $79 to modify the front side windows. Id. at 41,367. NHTSA stated that it would "not continue to examine a potential requirement for advanced side glazing." Id. NHTSA decided that it was "more appropriate to devote its research and rulemaking efforts . . . to projects other than ejection mitigation through advanced glazing" and that in the future it would focus its efforts on developing "more comprehensive, performance-based test procedures" to evaluate potential new technologies. Id.

In 2005, however, Congress passed a law requiring NHTSA to initiate rulemaking in two areas: rollover prevention (including "stability enhancing technologies" which prevent vehicles from rolling over) and "[o]ccupant ejection prevention." Id. § 30128(b), (c).[2] As part of this comprehensive response to rollover accidents, NHTSA has continued to research the ways that advanced glazing can reduce occupant ejection. See, e.g., Stephen Summers et al., Nat'l Highway Traffic Safety Admin., NHTSA's Crashworthiness Rollover Research Program, Paper No. 05-2079, at 4 (2005) (reporting on crashworthiness tests employing "advanced side glazings developed under previous NHTSA research").

---

[2] Some of the regulatory initiatives NHTSA has undertaken under this law include NHTSA, Roof Crush Resistance, Notice of Proposed Rulemaking, 70 Fed. Reg. 49,223, 49,236 (Aug. 23, 2005); NHTSA, Electronic Stability Control Systems, Notice of Proposed Rulemaking, 71 Fed. Reg. 54,712, 54,713–16 (Sept. 18, 2006); NHTSA, Side Impact Protection; Side Impact Phase-In Reporting Requirements, Notice of Proposed Rulemaking, 69 Fed. Reg. 27,990 (May 17, 2004).

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment on preemption grounds de novo. Wright v. Allstate Ins. Co., 415 F.3d 384, 389 (5th Cir. 2005). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Brewer v. Wilkinson, 3 F.3d 816, 819 (5th Cir. 1993).

## III. DISCUSSION

This appeal is about whether FMVSS 205, which governs motor vehicle glazing safety, preempts a common law suit alleging that GM's use of a permitted glazing technology was unsafe. We are the first appellate court to rule on this question.[3] NHTSA studied the question of whether to require advanced glazing in side windows for over a decade and decided in 2002 to leave the existing glazing standards in place and pursue a "comprehensive, performance-based" approach to ejection mitigation instead. Notice of Withdrawal, 67 Fed. Reg. at 41,365. GM argues that this decision embodies a federal policy regarding motor vehicle glazing which would be frustrated by a Texas common-law rule requiring advanced glazing in side windows. GM contends that this conclusion is compelled by Geier v. American Honda Motor Co., 529 U.S. 861 (2000), which found that FMVSS 208 (the NHTSA safety standard for occupant crash protection), preempted state common law claims. See 49 C.F.R. § 571.208. The O'Haras argue that FMVSS 205 differs significantly from FMVSS 208 and that NHTSA's decision not to require advanced glazing in side windows left FMVSS 205 intact as a "minimum safety standard" that does not preempt state tort actions. Geier, 529 U.S. at 869–70. They also argue that NHTSA's decision not

---

[3] We are not aware of any other Court of Appeals or state appellate court ruling on the preemptive scope of FMVSS 205 in this context. Two district courts considering similar claims cited O'Hara, 2006 WL 1094427, and held that the claims were preempted. Martinez v. Ford Motor Co., 488 F. Supp. 2d 1194, 1196–97 (M.D. Fla. 2007); Erickson v. Ford Motor Co., No. CV-04-88-BU-RFC, 2007 WL 2302121, at *5–6 (D. Mont. Aug. 7, 2007).

to require advanced glazing in side windows is similar to the Coast Guard's decision not to require propeller guards, which was held to be non-preemptive in Sprietsma v. Mercury Marine, 537 U.S. 51 (2002). Because we find that FMVSS 205 differs significantly from FMVSS 208 and does not establish a federal policy which would be frustrated by a state common law rule requiring advanced glazing in side windows, we hold that the O'Haras' suit is not preempted.

A. Implied Conflict Preemption

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982). Federal regulations can have a preemptive effect equal to that of federal laws. Id. Conflict preemption can arise in one of two ways, either "when compliance with both federal and state regulations is a physical impossibility" or "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (internal quotations and citations omitted). The second form of implied conflict preemption is at issue here.

The Geier Court authoritatively construed the statute under which FMVSS 205 was promulgated. 529 U.S. at 870–71. NHTSA promulgated FMVSS 205 under the authority granted to it by the FSA, 49 U.S.C. § 30101 et seq., and its predecessor, the National Traffic and Motor Vehicle Safety Act ("TSA"), 15 U.S.C. § 1318 et seq. The FSA contains both an express preemption provision, 49 U.S.C. § 30103(b) (formerly codified at 15 U.S.C. § 1392(d)), and a savings clause, 49 U.S.C. § 30103(e) (formerly codified at 15 U.S.C. § 1397(k)). The express preemption provision states that "[w]hen a motor vehicle safety standard is in effect under this chapter, a State . . . may prescribe or continue in effect a standard applicable to the same aspect of performance . . . only if the

standard is identical to the standard prescribed under this chapter." 49 U.S.C. § 30103(b)(1). This provision applies to state statutes and regulations. See Geier, 529 U.S. at 868 (construing the express preemption provision). The savings clause states that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." 49 U.S.C. § 30103(e). The savings clause "removes tort actions from the scope of the express preemption clause" and "preserves those actions that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor." Geier, 529 U.S. at 870 (construing the savings clause). The express preemption clause and the savings clause "read together, reflect a neutral policy, not a specially favorable or unfavorable policy, toward the application of ordinary conflict pre-emption principles." Id. at 870–71.[4]

## B.  FMVSS 205 and Federal Policy on Rollover Prevention

We must determine what federal policy FMVSS 205 expresses before we can decide whether the O'Haras' claims are subject to conflict preemption. When NHTSA regulations are only intended to create a "minimum safety standard," states are free to adopt common law rules which require a greater level of safety. Geier, 529 U.S. at 870; see also Wright v. Ford Motor Co., No. 05-41723, slip op. at 12–13 (5th Cir. Nov. 15, 2007) (noting that "compliance with federal motor vehicle safety standards . . . does not exempt a person from liability at common law" (internal quotations omitted)). When a federal safety standard deliberately leaves manufacturers with a choice among designated design options in order to further a federal policy, a common law rule which would force manufacturers to

---

[4] The O'Haras argue that Bates v. Dow Agrosciences L.L.C. requires this Court to impose a presumption against preemption here. 544 U.S. 431, 449–50 (2005) (construing the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq.). Because we hold that FMVSS 205 is a minimum safety standard which does not preempt the O'Haras' suit regardless of any presumption against preemption, we do not reach this issue.

adopt a particular design option is preempted. Id. at 875, 878–79; see also Hurley v. Motor Coach Indus., 222 F.3d 377, 382 (7th Cir. 2000) (holding that the safety restraint policies expressed in FMVSS 208 would be frustrated by a common law rule requiring three-point seatbelts in heavy vehicles). Finally, a federal agency's choice not to require a particular safety measure and leave the regulatory status quo intact is not necessarily preemptive. Sprietsma, 537 U.S. at 65 (holding that the Coast Guard's "decision not to regulate a particular aspect of boat safety is fully consistent with an intent to preserve state regulatory authority pending the adoption of specific federal standards").

To determine the federal policy expressed in FMVSS 205, this Court looks to the text of the regulation, the history of NHTSA regulation in this area, and NHTSA or Department of Transportation statements construing FMVSS 205. Geier, 529 U.S. at 875–77. In order to find implied conflict preemption, it is not necessary for an agency to provide a "specific expression of agency intent to pre-empt, made after notice-and-comment rulemaking." Id. at 885.

FMVSS 205's text and history are straightforward. The text of the regulation incorporates the ANSI standards for glazing materials and provides minimal restrictions on the placement of different types of glass. 49 C.F.R. § 571.205, S3.2(a). Prior to 2003, FMVSS 205 included the text of the 1980 ANSI standards and piecemeal amendments; the 2003 amendments deleted much of the existing text and incorporated the 1996 ANSI standards by reference. See Glazing Materials Final Rule, 68 Fed. Reg. at 43,965. The 1996 ANSI standards only require manufacturers to test small sections of the glazing materials, usually under one square foot. See ANSI/SAE Z26.1-1996 § 3. With the exception of the test for glazing materials to be used in "egress" windows, none of the glazing materials are tested in the frame in which they will ultimately be used. See id. §§ 3, 5.25. On its face, FMVSS 205 is a materials

standard that sets a safety "floor" to ensure that the glazing materials used by manufacturers meet certain basic requirements.

In addition, the text of FMVSS 205 differs significantly from FMVSS 208, the regulation considered in Geier. FMVSS 208, entitled "Occupant crash protection," includes detailed implementation timelines which required manufacturers to introduce airbag technology gradually prior to 1997. See 49 C.F.R. § 571.208, S4.1.5.2.1 ("The amount of passenger cars complying with the [regulation] by means of [an airbag] shall not be less than 95 percent of the manufacturer's total production of passenger cars manufactured on or after September 1, 1996, and before September 1, 1997."). FMVSS 208 requires manufacturers to conduct tests involving full vehicles and different-sized crash test dummies. See id. § 571.208, S5. For passenger vehicles produced in 1987 (the model year of the vehicle at issue in Geier), FMVSS 208 permitted manufacturers to comply with the crash protection requirements by using one of several specific protection system "options" set out in the standard. Geier, 529 U.S. at 865; 49 C.F.R. § 571.208, S4.1.3.2. In Geier and later in Hurley, federal courts held that the carefully constructed safety restraint options and timelines in FMVSS 208 preempted state common law actions which would impose liability on manufacturers for failing to adopt litigants' proposed improvements. Geier, 529 U.S. at 875, 878–79; Hurley, 222 F.3d at 383. The text of FMVSS 208 strongly supports the conclusion that it expresses a federal policy which would be frustrated by lawsuits seeking to establish common law rules to the contrary. All of these factors—detailed implementation timelines, full vehicle testing procedures and "options" language—are conspicuously absent from FMVSS 205.

Next we turn to NHTSA's statements interpreting FMVSS 205 to see if NHTSA has clearly articulated a glazing materials policy which would be frustrated by the O'Haras' suit. Federal agency statements interpreting specific agency regulations are given substantial deference. Auer v. Robbins, 519 U.S.

452, 461 (1997). The Geier and Hurley courts had the benefit of extensive pre-litigation agency statements interpreting FMVSS 208 and making NHTSA's occupant crash protection policy clear. Geier, 529 U.S. at 877–78 (citing NHTSA, Occupant Crash Protection Final Rule, 49 Fed. Reg. 28,962, 29,003 (July 17, 1984) (codified at 49 C.F.R. § 571.208)); Hurley, 222 F.3d at 382 (citing NHTSA, Occupant Crash Protection Final Rule, 53 Fed. Reg. 25,338, 25,341 (July 6, 1988) (codified at 49 C.F.R. § 571.208)). Hurley stated that "[t]he commentary accompanying the final rules indicates that even the details of seat belt design—such as the retractor mechanism, mounting position, and buckle releases—were hotly debated during the rulemaking process" and "that seat belt use among heavy truck drivers is far below the national average for all vehicles." 222 F.3d at 382. In light of this specific and detailed commentary, the Hurley court concluded that a common law rule requiring three point seat belts "could reduce utilization and thereby undermine FMVSS 208's safety objectives." Id. Likewise, the NHTSA Final Rule commentary on the 1984 version of FMVSS 208 at issue in Geier is 47 pages long and lays out in detail the agency's concerns regarding public acceptance of airbag technology. 49 Fed. Reg. at 28,987–89, 29,000–03. The Geier Court concluded that a common law rule imposing liability for not installing airbags in all their cars would frustrate NHTSA's clearly stated and safety-based policy of encouraging manufactures to introduce airbags gradually in order to win over a skeptical public. 529 U.S. at 877–78. The manufacturers in Geier and Hurley identified specific statements in NHTSA's official commentary on FMVSS 208 which supported their position that the plaintiffs' safety enhancements would actually frustrate NHTSA's safety goals. Id.; Hurley, 222 F.3d at 382.

The NHTSA Final Rule commentary on the 2003 version of FMVSS 205 at issue here is very different from the commentary on FMVSS 208 analyzed in Geier and Hurley. It is short (only eight pages in the Federal Register) and does

not discuss NHTSA's rollover protection policies. Glazing Materials Final Rule, 68 Fed. Reg. at 43,971. The commentary identifies the policy goal behind the update as increasing the clarity and usability of the standard. Id. at 43,964 (stating that "[t]he amendments of the past 20 years have resulted in a patchwork of requirements" and that incorporating the 1996 ANSI standards by reference "permits the deletion of most of the existing text of the Federal standard"). There is no language in the Glazing Materials Final Rule commentary indicating that NHTSA intended to "preserve the option" of using tempered glass in side windows, or that preserving this option would serve the safety goals of FMVSS 205. Both the text of FMVSS 205 and the Final Rule commentary support the conclusion that it is a minimum safety standard.

Having considered the text and history of FMVSS 205 as well as NHTSA's official commentary on the standard, we now turn to other statements by NHTSA regarding advanced glazing to see if they express federal safety policies which would be frustrated by the O'Haras' suit. Agency statements of policy which do not interpret regulations have only persuasive authority. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). During the 1990s NHTSA considered amending FMVSS 205 to require advanced glazing in side windows. Notice of Withdrawal, 67 Fed. Reg. at 41,365. Ultimately NHTSA issued a Notice of Withdrawal explaining why it declined to do so. Id. We consider the Notice of Withdrawal to determine whether it clearly indicates a federal policy regarding advanced glazing in side windows which would be frustrated by the O'Haras' suit.

In its Notice of Withdrawal, NHTSA gave three principal reasons for its decision to discontinue rulemaking in the area of advanced glazing. First, NHTSA cited "the advent of other ejection mitigation systems, such as side air curtains, and the need to develop performance standards for them." Notice of Withdrawal, 67 Fed. Reg. at 41,367. Second, it noted that advanced glazing "in

some cases appears to increase the risk of neck injury" Id. NHTSA research showed that advanced glazing successfully protected occupants from ejection in rollover crashes, but some data indicated that advanced glazing might slightly increase the likelihood of minor neck injuries when compared to tempered glass. Id. at 41,366–67. Third, it cited industry cost concerns and noted that "[a]dvanced side glazing would require modifications to the design of all vehicles currently being produced to make their windows smaller, and the costs of such a design modification would be significant." Id. at 41,367. Overall, the Notice of Withdrawal emphasizes the existence of other promising rollover protection technologies and NHTSA's need to devote resources to developing procedures to test them.

In Sprietsma the Supreme Court considered the Coast Guard's decision not to require propeller guards on all boats and held that it did not preempt a common law suit claiming negligence for failing to install such a safety device. 537 U.S. at 70. The Coast Guard initiated research and rulemaking with regard to "propeller strike accidents" in the late 1980s. Id. at 61. The research focused on propeller guards, and in 1990 the Coast Guard decided to "take no regulatory action" with regard to them. Id. at 66. The Coast Guard relied on three principal reasons for its decision. First, it stated that the available accident data did not meet the stringent criteria for federal regulation. Id. Agency research revealed that propeller guards "might prevent penetrating injuries but increase the potential for blunt trauma caused by collision with the guard." Id. at 61. Second, it cited the limitations of existing propeller guard technology, including the lack of a single, universally applicable guard. Id. at 65. Third, the Coast Guard noted that the cost of "retrofitting millions of boats would certainly be a major economic consideration." Id. at 66 (internal quotations omitted). The Coast Guard continued to study propeller strike accidents and eventually initiated rulemaking procedures which would permit boat owners to choose

between several different "propeller injury avoidance measures." Id. at 62 (internal quotations omitted). The Court stated:

> [The Coast Guard statement declining to require propeller guards] reveals only a judgment that the available data did not meet the . . . "stringent" criteria for federal regulation. The Coast Guard did not take the further step of deciding that, as a matter of policy, the States . . . should not impose some version of propeller guard regulation, and it most definitely did not reject propeller guards as unsafe.

Id. at 66–67. The Court held that nothing in the Coast Guard's official explanation for not requiring propeller guards on all boats "would be inconsistent with a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular kind of boat" and that it did not "convey an authoritative message of a federal policy against propeller guards." Id. at 67 (internal quotations omitted).

We find the parallels between NHTSA's Withdrawal of Rulemaking and the Coast Guard's statements in Sprietsma to be compelling. NHTSA's 2002 Notice of Withdrawal focused on the need to develop experimental standards for new rollover accident technologies. It did not reject advanced glazing as unsafe (indeed, FMVSS 205 continued to require advanced glazing in vehicle windshields). Like the Coast Guard, the NHTSA Notice of Withdrawal cited cost concerns and minor safety issues to justify the agency's change in course. And also like the Coast Guard, NHTSA has continued to study advanced glazing as part of its rollover protection program. NHTSA's Notice of Withdrawal "does not convey an authoritative message of a federal policy against" advanced glazing in side windows.[5] Id. (internal quotations omitted). The Notice of Withdrawal

---

[5] Our conclusion here is consistent with NHTSA's assessment of the preemptive effect of its failure to regulate in other contexts. In 2000, NHTSA announced that it was considering amending FMVSS 111 to require advanced rear visibility systems (such as cross-view mirrors or driver-warning backup alerts) on straight trucks. NHTSA, Rear Visibility Systems, Advance Notice of Proposed Rulemaking, 65 Fed. Reg. 70,681, 70,681 (Nov. 27, 2000). NHTSA stated that it was not planning to require such systems on passenger vehicles and light trucks

is the most relevant and authoritative NHTSA commentary raised by the parties, and nothing in the Notice of Withdrawal undermines the conclusion, drawn from the text and Final Rule commentary, that FMVSS 205 is a minimum safety standard.[6]

Because the text and commentary on FMVSS 205 show that it is best understood as a minimum safety standard, we hold that the O'Haras' common law negligence and strict liability claims are not preempted. See Geier, 529 U.S. at 870. The marketing and failure-to-warn claims which are dependent on them are also not preempted. Cf. Griffith v. Gen Motors Corp., 303 F.3d 1276, 1282 (11th Cir. 2002) ("Inasmuch as [the failure-to-warn claim] is tied to her claim of defect, it too is preempted.").

C.    O'Haras' Noncompliance and Defective Implementation/Design Claims

In the O'Haras' response to GM's motion for summary judgment, they claimed that the tempered glass windows in the Tahoe did not comply with FMVSS 205 and that they were not properly designed or implemented. The district court dismissed the noncompliance and tempered glass design/implementation claims because it found they were not disclosed in the O'Haras' expert reports and were raised for the first time in response to GM's motion for summary judgment. O'Hara, 2006 WL 1094427, at *6–7 (citing Cutrera v. Bd. of Supervisors of La. State Univ., 429 F.3d 108, 113 (5th Cir.

---

for cost and safety reasons, including the state of existing technology. Id. at 70,685. NHTSA did not consider its decision to be preemptive. Id. at 70,682–83. NHTSA stated its position that FMVSS 111 "does not preempt any State from requiring cross-view mirrors" and noted with approval a Washington state law requiring additional rear visibility systems on certain light trucks. Id.; see Wright v. Ford Motor Co., No. 05-41723, slip op. at 12–13 (5th Cir. Nov. 15, 2007).

[6] We note that in Sprietsma and Geier the regulatory agencies filed amicus curiae briefs. Sprietsma, 537 U.S. at 67–68; Geier, 529 U.S. 883–85. Geier held that these post-litigation statements were entitled to weight, particularly where they were consistent over time with other Agency statements. Id. at 883. Unfortunately, we do not have the benefit of NHTSA's opinion here.

2005)). Because the district court relied on the O'Haras' expert reports in dismissing these claims, we construe this decision as a grant of summary judgment. See Balogun v. INS, 9 F.3d 347, 352 (5th Cir. 1993) ("[A] decision which disposes of a party's claim by reference to evidence from outside of the pleadings is construed as a grant of summary judgment."). We reverse the district court's grant of summary judgment on the O'Haras' noncompliance claim because it was adequately disclosed in the O'Haras' expert reports. A similar analysis applies to the tempered glass design/implementation claim, which was adequately pled in the O'Haras' complaint. We nevertheless affirm the grant of summary judgment with regard to this claim for other reasons.

As a threshold matter, we note that GM did not move for summary judgment on either the noncompliance or tempered glass design/implementation claims. The O'Haras argue that the district court erred by granting summary judgment on these claims sua sponte without giving them ten days' notice as required by Federal Rule of Civil Procedure 56(c). Judwin Props., Inc. v. U.S. Fire Ins. Co., 973 F.2d 432, 436–37 (5th Cir. 1992). We reject this argument because this Circuit recognizes a harmless error exception to the ten day notice rule. See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 28 F.3d 1388, 1398 (5th Cir. 1994) (holding that "[sua sponte] summary judgment will be considered harmless if the nonmovant has no additional evidence or if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact"); Norman v. McCotter, 765 F.2d 504, 508 (5th Cir. 1985). Any error by the district court in considering the O'Haras' additional claims on summary judgment was harmless. The O'Haras placed these claims at issue by raising them in their January 2006 reply brief to GM's motion for summary judgment, to which they attached a 500-page appendix. They re-asserted these claims in their sur-reply brief in March 2006, which was filed with a 400-page appendix.

16

Under these circumstances, the O'Haras were afforded an adequate opportunity to present the evidence supporting their claims and an additional ten days' notice would not have served any valid purpose.

(1)     Noncompliance with FMVSS 205

We reverse the district court's grant of summary judgment on the noncompliance claim because we hold that it was adequately alleged in the O'Haras' expert report. The report prepared by the O'Haras' expert, Stephen Batzer, states that "the tempered glazing used on the side [windows] of [the Tahoe] does not retain occupants in rollover collisions. This is in clear contravention to the stated purpose of the pertinent federal standard." GM argues that noncompliance with FMVSS 205's purposes is different than noncompliance with its actual requirements. We do not reach the merits of this argument because we hold that the district court erred in concluding that the noncompliance theory was not timely disclosed. We reverse the district court's procedural dismissal and remand for consideration of the parties' substantive claims below.

(2)     Tempered Glass Design/Implementation

The district court granted summary judgment on the tempered glass design/implementation claim because it held that it was not alleged in the O'Haras' expert reports and was pled for the first time in the O'Haras' response to GM's motion for summary judgment. We hold that although the alternative tempered glass claim was adequately pled, the grant of summary judgment is proper because the alternative designs proposed by the O'Haras in their expert reports and relied on by them in their pleadings at the district court and on appeal are not actually tempered glass designs.

The O'Haras' complaint alleged that there were "safer alternative designs" which would have prevented the injuries here. Under liberal notice pleading, "safer alternative designs" may fairly be read to include alternative tempered

glass designs. See Gen. Elec. Capital Corp. v. Posey, 415 F.3d 391, 396–97 (5th Cir. 2005) (holding that the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims" (internal quotations omitted)). The claim was adequately pled and should not have been dismissed on procedural grounds.

The O'Haras proposed four alternative "tempered glass" designs in their expert reports, all of which would have been safer than the tempered glass design actually used in the Tahoe. Each of these designs, however, involved tempered glass combined with layers of plastic or laminated glass. The ANSI definition of tempered glass states that it is "a single piece of specially treated . . . glass" and that laminated glass is "two or more pieces of . . . glass bonded together by an intervening layer . . . of plastic material." ANSI/SAE Z26.1-1996 §§ 1.6, 1.21. These alternative designs are in fact advanced glazing designs and are indistinguishable from the O'Haras' claim that GM should have used advanced glazing in the side windows of the Tahoe. The grant of summary judgment is proper with regard to the tempered glass design/implementation claim because the O'Haras did not identify a safer tempered glass design in their expert reports or pleadings.

## IV. CONCLUSION

We hold that FMVSS 205 does not preempt the O'Haras' common law tort claim against GM for failing to use advanced glazing in the side windows of the Tahoe. We hold that the O'Haras' marketing and failure-to-warn claims are also not preempted. We hold that the O'Haras' claim that the Tahoe failed to comply with FMVSS 205 was adequately alleged in their expert report and reverse the district court's grant of summary judgment. We affirm the district court's dismissal of the alternative tempered glass design claims. We REVERSE in

part, AFFIRM in part and REMAND for further proceedings consistent with this opinion.