# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 2, 2013

No. 12-30791

Lyle W. Cayce
Clerk

MEDCO ENERGI US, L.L.C.,

Plaintiff-Appellant

v.

SEA ROBIN PIPELINE COMPANY, L.L.C.,

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:09-CV-971

Before GARZA, SOUTHWICK, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Medco Energi US, a natural gas producer, brought Louisiana state law claims against Sea Robin Pipeline Company, a natural gas transporter. The claim was that Sea Robin materially misrepresented to Medco how long it would take to complete repairs to its gas pipeline that was damaged by Hurricane Ike. Medco appeals the district court's grant of summary judgment in favor of Sea Robin. We AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30791

FACTS

Sea Robin transports natural gas via pipeline for producers like Medco from the Outer Continental Shelf to onshore transportation facilities. As a transporter of natural gas, Sea Robin is subject to Federal Energy Regulatory Commission ("FERC") jurisdiction and operates its pipeline under a tariff approved by FERC. The tariff provides terms and conditions applicable to the services Sea Robin provides to its various classes of customers. In 2008, Sea Robin offered interruptible service to its customers at 1/30th the cost of firm service. The provisions of Sea Robin's interruptible service tariff provided that its service "shall be provided on an interruptible basis," and that

> [t]o the extent that Sea Robin complies with the provisions of its General Terms and Conditions and its Rate Schedule ITS [Interruptible Transportation Service], it shall have no liability to any shipper receiving service under Rate Schedule ITS arising from or related to service thereunder except as provided in such General Terms and Conditions and Rate Schedule ITS.

The tariff also provided that "Sea Robin makes no representation, assurance or warranty that capacity will be available on Sea Robin's Pipeline System at any time" and that "Sea Robin shall not be required to perform service unless all facilities necessary to render the requested service exist and are in good operating condition." Medco was one of Sea Robin's interruptible service customers.

In September 2008, Hurricane Ike caused over $118 million in damage to Sea Robin's facilities. While Sea Robin repaired its pipeline, Medco and all other producers in an area in the Gulf known as West Leg were unable to transport gas. Sea Robin initiated FERC proceedings to recover the costs associated with repairing its pipeline. Medco and other parties moved to intervene and protest in the proceedings, but Medco did not pursue its protest beyond filing the motion. Other shippers, though, claimed in the proceeding that "there [were]

2

No. 12-30791

questions regarding whether Sea Robin did act expeditiously and efficiently to restore system operations." FERC found Sea Robin resumed service as quickly as possible after the hurricane. It allowed Sea Robin to impose a surcharge that would allow recovery of its restoration costs over the course of 21.4 years.

In May 2009, Medco filed suit in state court in Lafayette Parish, Louisiana, claiming negligence, negligent misrepresentation, detrimental reliance, fraud, and violations of Louisiana's Unfair Trade Practices Act. Sea Robin removed the case to the United States District Court for the Western District of Louisiana, invoking diversity jurisdiction and arguing the claims arose out of operations on the Outer Continental Shelf. 43 U.S.C. § 1349(b)(1).

Medco's claims were based primarily on its allegation that Sea Robin misrepresented when the pipeline would again be available for use. The claims were based on Sea Robin's providing "critical notices" after the hurricane about the status of its line. These notices were posted on Sea Robin's website and e-mailed to customers. Medco alleged Sea Robin announced in one notice that the pipeline would return to service in early March 2009.

Medco closely monitored the progress of Sea Robin's repairs. Medco was contemplating purchasing another production block that also used Sea Robin's pipeline. As Medco's negotiations for the purchase progressed, it sought assurance from Sea Robin that its pipeline would be repaired on schedule. Medco's president, L. Dale Wooddy, III, contacted Sean Meehan, who oversaw Sea Robin's critical repair notices. Meehan allegedly assured Wooddy that there were no problems that would prevent the pipeline's return to service in March 2009 other than possible weather delays or typical small problems that may slightly shift the completion date. Meehan allegedly also told Wooddy there would be no capacity limitations or pressure changes in the line that would affect production from the block Medco intended to purchase. Sea Robin denied that it represented the repairs would be completed by March.

3

No. 12-30791

Medco claims it purchased the additional block in reliance on Sea Robin's representations. When delays in pipeline repairs went beyond the ostensibly promised dates, Medco constructed a gathering line to move production from the newly purchased block to market. Medco claims as damages the approximately $5 million spent to construct the gathering line. Medco also claims damages for the expenses incurred in restoring production from its existing blocks, its inability to get its production to market in a timely manner, and a reduction in the marketable value of its properties.

In March 2012, Sea Robin moved for summary judgment. It argued that Medco's claims were preempted by the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717-717z, or, alternatively, by the filed rate doctrine. The district court granted summary judgment in favor of Sea Robin on both grounds. Medco appealed.

DISCUSSION

We do not address the validity the district court's analysis of federal field preemption because we determine that the filed rate doctrine bars Medco's claims. We review the district court's grant of summary judgment *de novo*. *O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 757 (5th Cir. 2007).

FERC regulates transporters and sellers of natural gas in interstate commerce. 15 U.S.C. § 717. Transporters and sellers must file with FERC "schedules," i.e., tariffs "showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services," and charge only what FERC determines is "just and reasonable." 15 U.S.C. § 717c(a), (c). Any change to rates or services in the tariff must be filed in advance with FERC. 15 U.S.C. § 717c(d).

The filed rate doctrine recognizes the broad authority granted to agencies and not to the courts to determine whether the rates, including the services,

No. 12-30791

classifications, and practices included in the filing, are reasonable. 15 U.S.C. § 717c(c); *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). Under the doctrine, "any 'filed rate' – that is, one approved by the governing regulatory agency – is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 508 (5th Cir. 2005). The doctrine exists because "[i]t would undermine the congressional scheme of uniform rate regulation to allow a [ ] court to award as damages a rate never filed with the [regulatory agency] and thus never found to be reasonable within the meaning of the Act." *Ark. La. Gas Co.*, 453 U.S. at 579. Behind the doctrine is an anti-discriminatory policy, so it applies in cases involving discriminatory pricing or tariff issues and precludes claims that conflict with a tariff or would vary or enlarge a party's rights as defined by a tariff. *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223, 227 (1998) (*AT&T*).[1]

"Deviation from [the filed rate] is not permitted upon any pretext." *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915). Even if a rate is misrepresented to a customer and the customer relies on that rate, the promised rate will not be enforced if it conflicts with the filed rate. *AT&T*, 524 U.S. at 222. In *AT&T*, the Supreme Court explained that rates "do not exist in isolation." *Id.* at 223. Filed rates prevent discrimination "only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." *Id.*

The plaintiff in *AT&T*, Central Office Telephone ("COT"), purchased bulk long-distance service from AT&T and resold it to smaller customers. *Id.* at 216. COT signed a form stating its service would be governed by the AT&T tariffs.

---

[1] *AT&T* was decided under the Communications Act, but the same principles apply to the NGA. *See Ark. La. Gas Co.*, 453 U.S. at 577.

No. 12-30791

*Id.* at 219.  After experiencing problems with AT&T's network and billing, COT terminated its contract 18 months early.  *Id.* at 219-220.  COT also filed suit claiming state law breach of contract and tortious interference with contractual relations (i.e., COT's relationship with its customers).  *Id.* at 220.  Essentially, COT was complaining AT&T had intentionally misrepresented the benefits of its service.  *Id.*  The Supreme Court concluded the filed rate doctrine barred COT's state-law claims.  *Id.* at 226-27.  The Court found that the representations made to COT – faster service, allocation of charges, and other matters relating to calling cards and service support – "all pertain to subjects that are *specifically addressed* by the filed tariff."  *Id.* at 225.  As for the tortious interference claim, the Court found it was "wholly derivative of the contract claim for additional and better services."  *Id.* at 226.  COT could "no more obtain unlawful preferences under the cloak of a tort claim than it can by contract."  *Id.* at 227.

Cases such as the present one and *AT&T* ask this question: "[W]hen the plaintiff's claims – at least on their face – do not attempt to challenge a filed rate," do the claims "implicate the parties' rights and liabilities under that rate"? *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004). We hold that even if all of Medco's allegations of misrepresentation are true, allowing Medco to recover damages for its claims would conflict with the filed rate.  Under Sea Robin's tariff, Medco was subject to all conditions established by Sea Robin, including the following provisions: (1) Medco's service was on an interruptible basis, with no guaranteed right to delivery; (2) Sea Robin made no representation as to the capacity available on its pipeline;  (3) neither party had liability "arising out of any manner related to [the tariff]"; and (4) "Sea Robin [was] not [ ] required to perform service unless all facilities necessary to render the requested service exist[ed] and [were] in good operating condition." Because

Medco only paid for interruptible service subject to these provisions, allowing recovery for damages incurred when it could not use Sea Robin's pipeline would conflict with the interruptible rate and the provisions of the tariff.

Citing *AT&T*, Medco urges that the filed rate doctrine is only relevant when discriminatory business practices are at issue. Medco categorizes Sea Robin's supposed misrepresentations as to when it would be ready to resume transportation as an extra-contractual act that did not involve discrimination. Medco is correct that the filed rate doctrine does not bar all state law claims. *AT&T*, 524 U.S. at 230-31 (Rehnquist, C.J., concurring). Nonetheless, discriminatory privileges "come in many guises, and are not limited to discounted rates." *Id.* at 224 (majority opinion). If Medco recovered damages incurred for not being able to use Sea Robin's pipeline while it was being repaired, it would be a "special advantage" not provided for in the interruptible service rate. *See id.*

This is similar to the claims in *AT&T* where the Court stated, "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." *Id.* at 222. The *AT&T* Court did not allow COT's claims for misrepresentations about faster service because the tariff governed the speed of service. Similarly, Medco's claims of misrepresentation about repair times, though "extra-contractual," involve the specific subject matter of the tariff. Medco contracted for interruptible service with no guaranteed use of the pipeline. It cannot recover for Sea Robin's alleged misrepresentation or misquotation that conflicts with the tariff and would essentially provide Medco with a "rebate" for the time during which the pipeline was not operable. *See id.* at 223. The additional guarantee allegedly arising by virtue of the

misrepresentations about an expeditious return to operation is a subject that is "*specifically addressed* by the filed tariff." *See id.* at 225.

Medco also argues the filed rate doctrine does not apply because Medco is not suing for a breach of duty arising from the filed tariff. We have held that a tort claim is not barred by the filed rate doctrine provided that the duty allegedly breached is outside the contract. *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 711 (5th Cir. 1999). In that case, MCI and Access Telecom operated under an agreement whereby Access Telecom reoriginated phone calls through MCI and Telmex, a Mexican company. *Id.* at 701. Under the filed tariff that controlled this arrangement, if a foreign partner like Telmex threatened to block MCI's service, MCI was not liable to Access Telecom for halting service. *Id.* at 701, 711. When Telmex did threaten MCI, MCI not only halted service, it allegedly interfered with Access Telecom's ability to contract with another provider – thereby breaching duties outside the contract. *Id.* at 711. Thus, the filed tariff did not bar Access Telecom's tortious interference claims. *Id.*

*Access Telecom*'s holding as to tortious interference is fundamentally different from the claims at issue here. The tortious interference claims did "not concern the provision of services which are covered by the filed tariff." *Id.* The court's consideration of tortious interference would have no effect on the filed tariff. Here, the tariff exists to define Sea Robin's rates and services. Medco's damages are derived from its inability to use Sea Robin's pipeline; each of its claims relate directly to the transportation of gas, and thus are subject to the tariff's provisions. Unlike in *Access Telecom* where MCI directly interfered with Access Telecom's ability to do business with another company under circumstances unrelated to the tariff, Medco is seeking recovery for something – pipeline service – that the tariff's interruptible rate specifically limited. Allowing Medco's claims to go forward could result in Medco recovering for the

No. 12-30791

time during which it could not transport natural gas, even though the tariff established it had interruptible service.[2]

AFFIRMED.

---

[2] For the first time at oral argument, Medco argued that the tariff itself allows claims such as these to proceed. Medco refers to a provision in the tariff that discusses Sea Robin's liability related to Messenger®, Sea Robin's electronic communication system. We find no argument regarding this provision in the appellate briefing. The tariff states that Sea Robin

> expressly disclaims any and all liability for damages to Messenger® Subscriber, except for damages directly attributable to negligence, bad faith, fraud or willful misconduct of [Sea Robin], or to any third parties associated with Messenger® Subscriber's use of the Messenger® system arising out of or in any manner related to use by Messenger® Subscriber or [Sea Robin] of the Messenger® system, including but not limited to any damages resulting from any one or more of the following: (1) any acts of God or force majeure, including but not limited to sabotage, war, riot, lightning, vermin, fire, floods, electric storms . . . . [Sea Robin's] liability, if any, shall be limited to direct damages only incurred by the Messenger® Subscriber and shall not extend to consequential, indirect or punitive damages incurred by the Messenger® Subscriber or any damages of any nature whatsoever incurred by third parties.

What this quoted provision is supposed to do, its reach and its effect, are not matters to raise for the first time at oral argument. We will not analyze its effect. *See Mikeska v. City of Galveston*, 451 F.3d 376, 381 (5th Cir. 2006).