IN THE SUPREME COURT OF TEXAS
 
════════════
No. 
09-0048
════════════
 
MCI Sales and Service, Inc., 
f/k/a Hausman Bus Sales, Inc. and Motor Coach 
Industries Mexico, S.A. de C.V., f/k/a Dina Autobuses, S.A. de C.V., 
Petitioners,
 
v.
 
James Hinton, Individually and 
as Representative of the Estate of Dolores Hinton, Deceased, et al., 
Respondents
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Tenth 
District of Texas
════════════════════════════════════════════════════
 
 
Argued March 24, 2010
 
 
            
Justice Guzman delivered the opinion 
of the Court, in which Justice Hecht, 
Justice Wainwright, Justice Medina, Justice Johnson, Justice Willett, and 
Justice Lehrmann joined, and in 
which Chief Justice Jefferson 
joined as to Parts I and II.
 
            
Chief Justice Jefferson 
filed an opinion, dissenting in part.
 
            
Justice Green did not 
participate in the decision.
 
       
            
This appeal arises from a jury’s verdict in a suit brought against the 
manufacturer, importer, and distributor of a motorcoach. In 1995, when the motorcoach at issue here was manufactured, federal safety 
regulations governing the performance of these motorcoaches neither required nor forbade passenger 
seatbelts. These same regulations allowed manufacturers to choose between 
several types of glazing materials for use in the motorcoaches’ windows, and a manufacturer complied by using 
one of the required types. We must decide whether that regulatory silence and 
that choice evidence a congressional intent to preempt a McLennan County jury’s 
finding that the manufacturer of a motorcoach should 
have installed passenger seatbelts and should have used another permitted type 
of glazing material. Because we conclude that the jury’s verdict which is 
grounded in this state’s common law does not present any obstacle to the 
accomplishment of the federal regulatory scheme’s purpose, we hold that the 
federal safety standards at issue do not preempt state law.
            
We also apply Chapter 33 of the Texas Civil Practice and Remedies Code to 
a plan adopted by a bankruptcy court to apportion a debtor’s insurance proceeds 
among a group of creditors who filed claims against the bankruptcy estate. The 
unique plan allowed the claimants to either accept a mediated percentage of the 
proceeds or to litigate their claims before a special judge. Even if the 
claimants chose the latter course, their recovery was capped at 110% of the 
mediator’s award, and the claimants could agree at any time to full or partial 
distributions to any or all of the claimants. We must decide if this plan 
renders the debtor—who purchased the insurance policy funding the plan and whose 
further liability was discharged in bankruptcy—a settling person under Chapter 
33 for purposes of determining proportionate liability. We conclude that it 
does. Accordingly, we affirm the court of appeals’ judgment and remand to the 
trial court for further proceedings consistent with this opinion.
I. 
Background
            
On February 14, 2003, a group of friends chartered a bus[1] from Central Texas Trails to take them 
from Temple to Dallas for a concert. Heavy rain and fog reduced visibility, and 
as the bus crested a hill on Interstate 35 south of Waco, the driver saw that 
traffic had stopped due to an accident farther north. He attempted to change 
lanes to increase his stopping distance, but another car cut him off, so he 
steered into the earthen median and lost control of the bus. It crossed the 
median into southbound traffic and collided with a large sport utility vehicle, 
spun counterclockwise, and tipped over on its right side. The bus slid across 
the southbound lanes and came to rest in the ditch on the far side of the road. 
Most of the large, non-laminated glass windows on the right side of the bus 
shattered when it tipped over. The passengers were tossed from their seats and 
some were ejected through the broken windows. Five passengers were killed and 
several others were injured to varying degrees.
            
The bus owner and operator, Central Texas Trails, Inc., Central Texas Bus 
Lines, Inc., and Kincannon Enterprises, Inc. 
(collectively Central Texas), filed for Chapter 11 bankruptcy protection shortly 
after the accident. The bus crash victims filed creditor claims against Central 
Texas in the bankruptcy court. Central Texas maintained a $5 million liability 
insurance policy, and the carrier paid the policy limits into the bankruptcy 
court’s registry, creating a liability fund. The bus crash claimants 
participated in non-binding mediation, the goal of which was to formulate a plan 
for apportioning the fund. The mediator assigned a percentage of the fund to 
each claimant, and these percentages were incorporated into a plan submitted to 
the bankruptcy court for approval, which was given on October 21, 2003. Under 
the “Apportionment Plan,” a claimant could accept the mediator’s percentage and 
immediately receive that portion of the liability fund. If the claimant chose 
not to accept the mediator’s allocation, the claimant participated in a 
“Litigation Plan.” Under this plan, the claimants tried their claims to a 
special judge agreed to by the participants, and their recovery under this plan 
was capped at 110% of the mediator’s allocation. Further, the parties could 
agree at any time to approve a full or partial distribution to any or all 
participants. Central Texas’s tort liability in excess of the liability fund was 
discharged upon approval of its reorganization plan the following 
year.
            
On June 26, 2003, a group of the injured bus occupants (or their estates) 
and their relatives (the Plaintiffs)[2] filed suit against Motor Coach Industries 
Mexico, S.A. de C.V., and MCI Sales and Service, Inc., the bus’s manufacturer, 
importer, and distributor (collectively MCI), alleging the motorcoach was defectively designed because it lacked 
passenger seatbelts and laminated-glass windows. MCI attempted to join Central 
Texas and the bus driver as responsible third parties, but the trial court 
denied the motion and also refused to submit a question asking the jury if 
Central Texas and the driver were liable as responsible third parties or as 
settling parties to determine proportionate liability. Following a jury trial, 
the jury found for the Plaintiffs, making separate causative findings as to each 
claim. The jury found that the lack of seatbelts caused injuries to all of the 
Plaintiffs, and the lack of laminated-glass windows caused injuries to those 
ejected from the bus. The jury awarded over $17 million in damages.
            
After the jury’s verdict but before entry of judgment, the Plaintiffs, 
all of whom opted for resolution of their claims against Central Texas via the 
Litigation Plan, appeared before the special judge. The judge found that the bus 
driver’s negligence proximately caused the accident that produced the 
Plaintiffs’ injuries and that he was acting within the scope of his employment 
with Central Texas. Further, the judge determined that the jury’s damage awards 
in this case, with one exception, significantly exceeded the 110% maximum 
recovery under the Litigation Plan. Limiting the one participant’s recovery to 
what the jury awarded, the judge capped the remaining damage awards at the 110% 
maximum. Because of the limited funds, however, the awards were prorated so that 
each participant received a relative percentage of the actual award. In the end, 
each Litigation Plan participant (again, with the one exception) received a sum 
that is within two percent of the amount allocated by the mediator.[3] The bankruptcy judge approved the special 
judge’s report, and the payments were made. Thereafter, the trial court in this 
case entered judgment, adjusting the damage awards to account for the funds 
received under the Litigation Plan.
            
MCI appealed, and the court of appeals reversed and remanded. 272 S.W.3d 17, 20. As relevant here, the court rejected MCI’s 
preemption arguments but agreed that the trial court abused its discretion by 
not submitting a question to the jury regarding Central Texas and the bus 
driver’s proportionate liability as settling persons. MCI then petitioned this 
Court for review of the preemption issues, and the Plaintiffs cross-petitioned 
for review of the proportionate responsibility issue. We granted both petitions 
and consider the issues in order, beginning with federal preemption.
II. Federal 
Preemption
            
The Supremacy Clause dictates that the “Constitution, and the Laws of the 
United States which shall be made in Pursuance thereof . . . shall be the 
supreme Law of the Land; . . . any Thing in the Constitution or Laws of any 
State to the Contrary notwithstanding.” U.S. Const. art. VI, cl. 2. Thus, a law passed by Congress—acting within its 
enumerated powers—and signed by the President preempts any state law to the 
contrary, rendering it without effect. Maryland v. Louisiana, 451 U.S. 
725, 746 (1981); Mills v. Warner Lambert Co., 157 S.W.3d 424, 426 (Tex. 
2005) (per curiam); see also Wyeth v. Levine, 
129 S. Ct. 1187, 1206–07 (2009) (Thomas, J., concurring in the judgment) (noting 
the two structural limitations on the federal government’s power to preempt 
state laws, namely, the enumerated powers of Congress and the procedural 
requirements to enact a law, including bicameral passage and presentment to the 
President). Federal regulations properly adopted by an 
agency acting within its congressionally delegated authority likewise 
preempt a contrary state law. E.g., City of New York v. FCC, 486 
U.S. 57, 63–64 (1988) (citing La. Pub. Serv. Comm’n v. FCC, 476 U.S. 
355, 369 (1986)).
            
Congress may expressly preempt state law by means of statutory language, 
see, e.g., Cipollone v. Liggett 
Group, Inc., 505 U.S. 504, 516 (1992); Great Dane Trailers, Inc. v. 
Estate of Wells, 52 S.W.3d 737, 743 (Tex. 2001), or it may do so impliedly 
in one of two ways, by “so thoroughly occup[ying] a legislative field ‘as to make reasonable the 
inference that Congress left no room for the States to supplement it,’” Cipollone, 505 U.S. at 516 (quoting Fidelity Fed. 
Sav. 
& Loan Ass’n v. De la Cuesta, 458 U.S. 141, 153 (1982) (quotation marks 
omitted)), or by enacting a law that actually conflicts with state law, see 
id. (citing Pac. Gas & Elec. Co. v. State Energy Res. Conservation 
& Dev. Comm’n, 461 U.S. 190, 204 (1983)). A 
state law actually conflicts with a federal law when compliance with both is 
impossible or when the state law “stands as an obstacle to the accomplishment 
and execution of the full purposes and objectives of Congress.” Hines v. 
Davidowitz, 312 U.S. 52, 67 (1941); accord 
Great Dane Trailers, 52 S.W.3d at 743. The latter kind of conflict 
preemption, sometimes called obstacle preemption, is the only theory of 
preemption advanced by MCI in this case. See Geier 
v. Am. Honda Motor Co., 529 U.S. 861, 868 (2000) (holding that the National 
Traffic and Motor Vehicle Safety Act’s express preemption clause does not apply 
to common-law tort actions).
            
As the Supreme Court has observed, “the purpose of Congress is the 
ultimate touchstone in every pre-emption case.” Wyeth, 
129 S. Ct. at 1194 (quotation marks omitted). When 
Congress has explicitly stated that its legislation preempts state law, that 
intent is plain. See, e.g., Geier, 529 U.S. at 867–68 (concluding that the Safety 
Act’s express preemption clause preempts nonidentical 
standards contained in state legislation and regulations). At other 
times, Congress does not expressly state its preemptive purpose, but such intent 
is discoverable through the statutory language and structure, as when Congress 
occupies a field of regulation and leaves no room for states to operate. See, 
e.g., City of Burbank v. Lockheed Air Terminal Inc., 411 U.S. 624, 
633 (1973) (“It is the pervasive nature of the scheme of federal regulation of 
aircraft noise that leads us to conclude that there is pre-emption.”). But when 
preemption is premised on the obstacle a state law erects to accomplishing a 
federal purpose, divining that intent can be more challenging.[4] To discover the federal purpose with 
which the state law is in conflict, we examine the text of the relevant federal 
statute or regulation, the history of federal regulation in that subject area, 
and the agency’s statements construing the regulation. See Geier, 529 U.S. at 875–77; O’Hara v. Gen. Motors 
Corp., 508 F.3d 753, 759 (5th Cir. 2007) (“To determine the federal policy 
expressed in [the regulation], this Court looks to the text of the regulation, 
the history of [the agency’s] regulation in this area, and [the agency’s] 
statements construing [the regulation].”). A “specific, formal agency statement 
identifying conflict” is not necessary to conclude that a conflict exists, Geier, 529 U.S. at 884, and “[t]he weight we accord 
the agency’s explanation of state law’s impact on the federal scheme depends on 
its thoroughness, consistency, and persuasiveness,” Wyeth, 129 S. Ct. at 
1201. Courts must cautiously approach this interpretive task lest it become a 
“free wheeling judicial inquiry into whether a state 
[law] is in tension with federal objectives,” which “undercut[s] the principle 
that it is Congress rather than the courts that pre-empts state law.” Gade v. 
Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 111 
(1992) (Kennedy, J., concurring in part and concurring in the 
judgment).
            
With this framework in mind, we turn to the relevant federal law that MCI 
asserts preempts the jury’s verdict.
            
A. The Federal Motor Vehicle Safety Standards
            
Congress passed the National Traffic and Motor Vehicle Safety Act of 1966 
(Safety Act or Act), to reduce traffic accidents and their resulting injuries. 
Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State 
Farm Mut. Auto. Ins. Co., 463 U.S. 29, 33 (1983) 
(citing 15 U.S.C. § 1381 (1976) (current version at 49 U.S.C. § 30101)). 
Congress gave the Secretary of Transportation the authority to “prescribe motor 
vehicle safety standards. Each standard shall be practicable, meet the need for 
motor vehicle safety, and be stated in objective terms.” 49 
U.S.C. § 30111(a). A motor vehicle safety standard is “a minimum standard 
for motor vehicle or motor vehicle equipment performance.” Id. 
§ 30102(a)(9). The Secretary of Transportation 
in turn delegated authority to create the safety standards to the Administrator 
of the National Highway Traffic Safety Administration (NHTSA). 49 C.F.R. § 1.50. Over the years, NHTSA has promulgated and 
modified the Federal Motor Vehicle Safety Standards (FMVSS), of which FMVSS 205 
and 208 are at issue here. See id. §§ 571.205, .208.
                                    
1. FMVSS 
208—Federal Regulation of Seatbelts
            
In 1971, NHTSA issued FMVSS 208, which governed occupant crash protection 
and mandated seatbelts in motorcoaches for the driver 
only. See id. § 571.208, S4.4.1.[5] Two years later, NHTSA issued a Notice of 
Proposed Rule Making addressing passenger seating in buses. Bus Passenger Seating and Crash Protection, 38 Fed. Reg. 4776 (Feb. 22, 1973) (to be codified at 49 C.F.R. pt. 
571). NHTSA designed the proposed rules to protect bus passengers by 
requiring higher, stronger, and softer seats that contained the passengers 
during a crash. Id. In response to suggestions that seatbelts should be 
required, NHTSA proposed adding them as an alternate restraint system, replete 
with a detection system that warned the passenger and the driver of unfastened 
seatbelts. Id. The proposed rules were to affect all buses.
            
The following year, however, NHTSA withdrew the proposed standard for 
motorcoaches, determining that seating requirements 
for intercity and transit buses were not justified from a cost/benefit 
standpoint, and that seatbelt-usage surveys in intercity buses indicated few 
passengers would utilize seatbelts if provided. See School Bus Passenger 
Crash Protection, 39 Fed. Reg. 27,585 (July 30, 1974). The NHTSA did indicate 
that it would “propose standards in the future in this area if they are found 
desirable.” Id.[6]
            
MCI draws our attention to several other events of note.[7] In 1992, the chief counsel for NHTSA 
wrote a letter responding to an inquiry about New York legislation that would 
require seatbelts in motorcoaches. Letter from Paul 
Jackson Rice, Chief Counsel, NHTSA to C.N. Littler, Coordinator, Regulatory 
Affairs, Motor Coach Indus. (Aug. 19, 1992). He concluded that FMVSS 208 would 
preempt the New York legislation regarding, as relevant here, intercity buses 
weighing more than 10,000 pounds. He stated that “NHTSA expressly determined 
that there is not a safety need for safety belts or another type of occupant 
crash protection at these [passenger] seating positions.” In so opining, NHTSA’s 
counsel expressly cited and relied upon the 1974 notice in which NHTSA withdrew 
its proposed standards for motorcoach seating and 
seatbelt standards, the latter because of low usage rates.
            
In 2000, five years after the motorcoach here 
was built, NHTSA’s acting administrator wrote a letter to the chairman of the 
National Transportation Safety Board (NTSB), which had repeatedly asked NHTSA to 
study the desirability of seatbelt standards for motorcoaches, noting that motorcoach crashes killed about five people per year. Letter 
from Rosalyn G. Millman, Acting Adm’r, NHTSA, to Jim Hall, Chairman, NTSB (Mar. 3, 2000). 
Even so, NHTSA said it would explore ways to study the crashworthiness of motorcoaches, including the feasibility and safety of 
seatbelts, in association with their manufacturers. Two years later, NHTSA 
announced a joint public meeting with its Canadian counterpart, Transport 
Canada, regarding the safety of motorcoaches. See 
Notice of Public Meeting on Motorcoach Safety 
Improvements, 67 Fed. Reg. 14,903 (Mar. 28, 2002). NHTSA invited comment on 
several proposed safety improvements, including limiting the size of glazing 
materials, introducing roof crush safety standards, requiring side curtain 
airbags, and requiring seatbelts. Id. at 
14,904–05. Finally, in 2007, NHTSA issued a report recommending passenger 
seatbelts in motorcoaches following research designed 
to determine the best performance standards for the seatbelt assembly and seat 
anchorages. See NHTSA, 
Docket 2007-28793, NHTSA’s Approach to 
Motorcoach Safety 12–14. Based on this report, the Department of 
Transportation issued an action plan for motorcoach 
safety, in which it proposed to begin rulemaking to require seatbelts in motorcoaches. See U.S. Dep’t of Transp., Motorcoach Safety 
Action Plan 5 (2009). In August 2010, NHTSA followed up by publishing a 
Notice of Proposed Rulemaking (NPRM) that calls for three-point seatbelts for 
passenger seats in new motorcoaches. See 
Federal Motor Vehicle Safety Standards; Motorcoach 
Definition; Occupant Crash Protection, 75 Fed. Reg. 50,958 
(Aug. 18, 2010) (to be codified at 49 C.F.R. pt. 571).[8]
                                    
2. FMVSS 
205—Federal Regulation of Glazing Materials
            
FMVSS 205 “specifies requirements for glazing materials for use in motor 
vehicles.” 49 C.F.R. § 571.205, S1. It is intended to 
“reduce injuries resulting from impact to glazing surfaces, to ensure a 
necessary degree of transparency in motor vehicle windows for driver visibility, 
and to minimize the possibility of occupants being thrown through the vehicle 
windows in collisions.” Id. at S2. FMVSS 205 
incorporates by reference the standards of the American National Standards 
Institute (ANSI), specifically the standard for Safety Glazing Materials Z26.1 
[hereinafter ANSI/SAE Z26.1-1996].[9] Id. at S3.2(a). The parties do not dispute that the standard 
permitted several kinds of glazing materials, including, as relevant here, 
laminated or tempered glass,[10] and that MCI complied with the standard 
in manufacturing the subject bus. See ANSI/SAE Z26.1-1996, T.1 (Items 1 
& 2) (permitting laminated glass throughout a vehicle and tempered glass 
anywhere other than the windshield). The ANSI standard notes that “[o]ne safety 
glazing material may be superior for protection against one type of hazard, 
whereas another may be superior against another type. Since accident conditions 
are not standardized, no one type of safety glazing material can be shown to 
possess the maximum degree of safety under all conditions, against all 
conceivable hazards.” Id. § 2.2.
            
In 1988, NHTSA proposed advanced glazing requirements for passenger 
vehicles and received numerous comments questioning, among other things, “whether this material would actually increase injuries to 
belted occupants due to head injury, neck loading, and lacerations.” Withdrawal of Advance Notices of Proposed Rulemaking, 67 Fed. 
Reg. 41,365, 41,366 (June 18, 2002). In 1991, Congress mandated that NHTSA 
initiate rulemaking on rollover protection. Id. As part of this study, 
NHTSA focused on advanced glazing research as a possible method to reduce 
passenger ejections. Id. In 2001, Congress directed NHTSA to complete its 
study of glazing materials, and NHTSA issued a final report on the use of 
glazing materials to mitigate ejections. Id. at 
41,367. Based on this report, NHTSA decided to terminate 
rulemaking on the issue of advance glazing, citing safety and cost concerns. 
Id. Noting the advent of other ejection mitigation systems (such as side 
air curtains) and the possibility that advanced side glazing increased the risk 
of neck injuries in some cases, NHTSA determined that its time and resources 
were better spent on other projects that focused on developing “more 
comprehensive, performance-based test procedures.” Id. In the 2007 report 
on motorcoaches, NHTSA emphasized the importance of 
roof strength because deformations following a crash compromise the window’s 
ability to prevent ejections. See NHTSA’s Approach to Motorcoach Safety, 
supra, at 20. For that reason, NHTSA concluded that “purs[u]ing the seat belt and roof 
strength approaches has greater potential for providing improved motorcoach occupant protection than continuing only the 
glazing/window retention strategy.” Id. In sum, FMVSS 205 reflects 
NHTSA’s conclusion that no one type of glazing material is superior in all 
situations, and it leaves to the manufacturers the decision of what kind of 
material—so long as it is one of the required kinds—to use in a particular 
setting.
            
B. The Presumption Against 
Preemption
            
Before discussing whether preemption applies here, we must first address 
MCI’s argument that the court of appeals improperly applied a presumption 
against preemption. MCI contends that Geier 
rejected any “special burden” beyond the application of ordinary preemption 
principles. The Plaintiffs counter that the presumption is rooted in federalism, 
not in Geier’s analysis of the interplay 
between the Safety Act’s preemption and saving clauses. We agree in principal 
with the Plaintiffs while recognizing that the exact contours of the presumption 
are far from clear. See Robert N. Weiner, The Height of Presumption: 
Preemption and the Role of Courts, 32 Hamline L. Rev. 727, 727 (2009) (“Few 
aspects of Supreme Court jurisprudence are as contradictory and convoluted as 
the so-called ‘presumption against preemption.’”).
            
The United State Supreme Court noted a presumption against preemption in 
Rice v. Santa Fe Elevator Corp., grounding it in the states’ police power 
to regulate for the good of their citizens: “[W]e start with the assumption that 
the historic police powers of the States were not to be superseded by the 
Federal Act unless that was the clear and manifest purpose of Congress.” 331 
U.S. 218, 230 (1947); see also Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (“[B]ecause the States are independent sovereigns in our federal 
system, we have long presumed that Congress does not cavalierly pre-empt 
state-law causes of action.”). The presumption is particularly strong when 
Congress legislates “in [a] field which the States have traditionally occupied.” 
Rice, 331 U.S. at 230; see also Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005) (“In areas of 
traditional state regulation, we assume that a federal statute has not 
supplanted state law unless Congress has made such an intention clear and 
manifest.” (quotation marks omitted)). Citizens’ health 
and safety are “‘primarily and historically, . . . 
matter[s] of local concern,’” and thus states have “‘great latitude’” to protect 
“‘the lives, limbs, health, comfort, and quiet of all persons.’” Lohr, 518 U.S. at 475 (quoting Hillsborough County 
v. Automated Med. Labs., Inc., 471 U.S. 707, 719 (1985) and Metro. Life Ins. Co. v. Massachusetts, 471 
U.S. 724, 756 (1985)) (alterations in original).
            
Against this backdrop, the Supreme Court in Geier analyzed whether the Safety Act and 
FMVSS 208 preempted a common-law tort action in which the plaintiff claimed the 
automobile manufacturer was liable for failing to install airbags in a 1987 
vehicle. 529 U.S. at 865. The Court first addressed the 
Safety Act’s express preemption clause[11] and limited its application to state 
legislative and regulatory enactments, concluding that the Act’s saving 
clause[12] exempted common-law tort actions from 
the preemption clause’s scope. Id. at 867–68. 
The Court then rejected the argument that the saving clause foreclosed the 
operation of ordinary implied preemption principles, including obstacle 
preemption. Id. at 869. Further, the majority 
disagreed with the dissent’s suggestion that the two clauses together created a 
“special burden” disfavoring preemption. Compare id. at 870–74, with id. at 898–99 
(Stevens, J., dissenting). Instead, the majority considered the “language, 
purpose, and administrative workability” of the statutes and concluded that no 
reading of the two clauses favored jury-imposed safety standards over federal 
safety standards with which they actually conflict. Id. 
at 872–73. In such a case, the operation of ordinary preemption 
principles dictates that the state-law standard must give way.
            
We do not read Geier’s 
special-burden discussion to undermine the presumption against preemption. 
The former is rooted in two statutory provisions of the Safety Act, the latter 
in principles of federalism. Merely because the Safety Act’s saving clause does 
not create a special burden disfavoring preemption does not eliminate the 
respective spheres of state and federal sovereignty, and the presumption simply 
affords deference to the states’ long-standing rights to protect their citizens 
absent a clear directive from Congress. In the end, what the majority said in 
Geier does not negate the presumption 
against preemption.
            
What the majority did not say is another matter. MCI correctly notes the 
Geier majority’s silence regarding the 
presumption. The Geier dissent noticed 
as well and decried the majority’s refusal to apply what the dissent considered 
to be an “‘ordinary experience-proved principle[] of 
conflict pre-emption.’” Id. at 906–07 (Stevens, J., dissenting) (quoting 
id. at 874); see also Altria Group, Inc. v. Good, 129 S. Ct. 538, 
558 (2008) (Thomas, J., dissenting) (noting in a discussion of Riegel v. Medtronic, Inc., 552 U.S. 312 
(2008), which involved express preemption, the effect of the majority’s refusal 
to invoke the presumption: “Given the dissent’s clear call for the use of the 
presumption against pre-emption, the Court’s decision not to invoke it was 
necessarily a rejection of any role for the presumption in construing the 
statute.”). Commentators likewise concluded that the Geier majority upended the normal presumption 
against preemption.[13] In view of the Supreme Court’s recent 
statements on the issue, however, we cannot agree.
            
In Wyeth v. Levine, the Court considered whether federal law 
preempted, under the actual conflict theory, a Vermont jury’s finding that the 
manufacturer of the drug Phenergan failed to 
adequately warn of the risks associated with directly injecting the drug into a 
patient’s vein. 129 S. Ct. at 1190–91. The Court, relying on Lohr, stated the classic formulation of the 
presumption against preemption and rejected the dissent’s contention that the 
presumption should not apply to claims of implied conflict preemption. Id. at 1194–95 & n.3 (citing Lohr, 518 U.S. at 485 and Rice, 331 U.S. at 
230). According to the dissent, the Court had never—prior to 
Wyeth—definitively applied the presumption in the actual-conflict 
context. Id. at 1228–29 & n.14 (Alito, J., 
dissenting). From the majority’s language in Wyeth, we fail to see 
how the presumption does not apply to all preemption cases, including implied 
conflict cases. Id. at 1194–95 & n.3 (“For its 
part, the dissent argues that the presumption against pre-emption should not 
apply to claims of implied conflict pre-emption at all, but this Court has long 
held to the contrary.” (citation omitted)); see also Altria Group, 
129 S. Ct. at 543 (“When addressing questions of express or implied pre-emption, 
we begin our analysis with the assumption that the historic police powers of the 
States [are] not to be superseded by the Federal Act unless that was the clear 
and manifest purpose of Congress.” (quotation marks 
omitted; alteration in original)). That Geier addressed the Safety Act and Wyeth 
a different statute is, contrary to MCI’s position, irrelevant.[14] Accordingly, we 
apply the presumption that Congress did not intend to preempt contrary state law 
absent evidence that such a result was Congress’s clear and manifest 
purpose.
            
C. Seatbelts and Federal Preemption
            
Given that no federal safety standard even discusses passenger seatbelts 
in motorcoaches, MCI’s preemption claim is predicated 
on regulatory silence. That is, MCI argues that NHTSA’s failure to regulate was 
deliberate and has the same preemptive force as a regulation forbidding 
passenger seatbelts. While we agree that regulatory silence can preempt state 
law in rare occasions, we do not agree that NHTSA’s decision not to require 
seatbelts in motorcoaches is such an 
occasion.
            
The Supreme Court has stated that “a federal decision to forgo regulation 
in a given area may imply an authoritative federal determination that the area 
is best left unregulated, and in that event would have as much 
pre-emptive force as a decision to regulate.” Sprietsma v. Mercury Marine, 537 U.S. 51, 66 
(2002) (quoting Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. 
Comm’n, 461 U.S. 375, 
384 (1983) (quotation marks omitted)). In applying this 
standard, the Court focused on the agency’s explanation for its decision not to 
regulate. See id. at 66–67. Two cases in which 
the Court considered the preemptive effect of an agency’s decision not to 
regulate illustrate the rule’s application.
            
In Sprietsma, the Supreme Court 
considered whether a claim that a motor boat should have been equipped with a 
propeller guard was preempted by the Federal Boat Safety Act of 1971, 46 U.S.C. 
§§ 4301–4311 (Boating Act). Like the Safety Act, the Boating Act contains 
both an express preemption clause and a saving clause, which the Court 
interpreted the same way—the preemption clause only affected state legislation 
and regulations, and the saving clause preserved common-law tort actions. 537 U.S. at 63. Finding no express preemption, the Court 
unanimously rejected the claim that the tort action conflicted with the federal 
regulatory scheme. Id. at 65. Addressing the 
boat manufacturer’s argument that the “Coast Guard’s decision not to adopt a 
regulation requiring propeller guards on motorboats” had preemptive force, the 
Court responded: “It is quite wrong to view that decision as the functional 
equivalent of a regulation prohibiting all States and their political 
subdivisions from adopting such a regulation.” Id. Rather, that decision 
“is fully consistent with an intent to preserve state 
regulatory authority pending the adoption of specific federal standards.” Id. 
The Coast Guard decided not require propeller 
guards because doing so was not technically feasible, the cost of retrofitting 
boats was substantial, and accident data did not support such regulation; as 
such, the high standard for justifying regulations was not met. Id. at 66. Given this explanation, the Court found 
nothing in the Coast Guard’s statement “inconsistent with a tort verdict 
premised on a jury’s finding that some type of propeller guard should have been 
installed.” Id. at 67.
            
Similarly, in Freightliner Corp. v. Myrick, the Supreme Court 
refused to give preemptive force to regulatory silence: “We hold that the 
absence of a federal standard cannot implicitly extinguish state common law.” 
514 U.S. 280, 282 (1995). The plaintiffs claimed the 
tractor-trailers that crashed into their vehicles should have been equipped with 
antilock braking systems (ABS). The Safety Act and NHTSA regulations did not 
require such braking systems,[1][5] but the manufacturer argued “that the 
absence of regulation itself constitutes regulation.” Id. 
at 286. The Court distinguished an earlier case in which it had 
stated that the failure of federal officials “affirmatively to exercise their 
full authority takes on the character of a ruling that no such regulation is 
appropriate or approved pursuant to the policy of the statute.” Id. at 
286 (quoting Ray v. Atl. Richfield Co., 435 U.S. 151, 178 (1978) 
(quotation marks omitted)). In Ray, Congress had intended to consolidate 
all regulatory power in the federal government, whereas in Myrick, 
“NHTSA did not decide that the minimum, objective safety standard required 
by [the Safety Act] should be the absence of all standards, both federal and 
state.” Id. at 286–87.
            
From these cases, it follows that an agency’s mere decision to leave an 
area unregulated is not enough to preempt state law. Instead, the agency must, 
consistent with the authority delegated to it by Congress, affirmatively 
indicate that no regulation is appropriate. That is, the agency must state that 
not only will it leave the area unregulated, it will 
not allow any regulation in that area as a matter of policy. Unless the agency 
takes this “further step” to disallow state regulation, its decision not to 
regulate has no preemptive force. Sprietsma, 
537 U.S. at 67.
            
When looking at NHTSA’s comments regarding passenger seatbelts in motorcoaches, we do not find any expression of intent to 
forbid state regulation. NHTSA proposed a requirement for passenger seatbelts in 
1973 along with modified seating standards designed to contain passengers during 
a crash. See 38 Fed. Reg. 4776 (Feb. 22, 1973). The following year NHTSA 
continued to advance such seating standards in school buses, but decided to 
withdraw the proposed standards for motorcoaches and 
transit buses: “The NHTSA has in fact determined that seating requirements for 
intercity and transit buses are not justified, based on benefit/cost studies of 
present seating performance in these buses. . . . Seat belt usage surveys in 
intercity buses also indicate that a very low percentage of passengers would 
utilize seat belts if they were provided. . . . The NHTSA will, of course, 
propose standards in the future in this area if they are found desirable.” 
School Bus Passenger Crash Protection, 39 Fed. Reg. 27,585 (July 30, 1974). This 
explanation indicates that NHTSA simply determined that the cost of installing 
seatbelts was not justified given the low usage rates.[16] Nothing in these few sentences evidences 
an intent to prevent a state jury from concluding that seatbelts in a particular 
setting were appropriate. The similarity of NHTSA’s decision to the Coast 
Guard’s decision in Sprietsma not to 
regulate is compelling. Like NHTSA, the Coast Guard had considered and rejected 
a proposed standard intended to increase user safety on the grounds that it was 
not justified. See 537 U.S. at 66. Both agencies engaged in cost/benefit 
analyses and concluded that the costs outweighed the benefits based on the 
relevant data. In Sprietsma, the Supreme Court 
found no preemption under these circumstances. On these facts, we reach the same 
conclusion. Because we find no clear and manifest statement in the 1974 
withdrawal of the proposed regulations—NHTSA’s final, official statement on the 
subject before the motorcoach here was 
manufactured—that NHTSA intended as a matter of policy to forbid any state 
requirement of passenger seatbelts in motorcoaches, we 
must conclude that the jury’s verdict in this case is not preempted by federal 
law.[17]
            
Nor does any later evidence change the analysis. The letter of NHTSA’s 
chief counsel in 1992 is unremarkable insofar as it concludes that the Safety 
Act would preempt nonidentical New York 
legislation—the Act’s express preemption clause compels such a conclusion. 
See 49 U.S.C. § 30103(b)(1). But then 
NHTSA’s counsel opined that the agency had “expressly determined that there is 
not a safety need for safety belts or another type of occupant crash protection 
at these seating positions” and cited the 1974 withdrawal of proposed 
regulation. Letter from Paul Jackson Rice, Chief Counsel, NHTSA to C.N. Littler, 
Coordinator, Regulatory Affairs, Motor Coach Indus. (Aug. 19, 1992). We refuse 
to give preemptive force to this sentence for two reasons. First, there is 
nothing in this statement that indicates opposition to seatbelts and an 
affirmative desire to forbid their use. Second, to hold that NHTSA’s decision 
not to regulate preempts state law based on a letter written eighteen years 
after the official decision illustrates the dangers of obstacle preemption 
grounded in agency musings. A letter, even by NHTSA’s chief counsel, is not 
federal law, nor it is particularly persuasive 
regarding NHTSA’s intent in the 1974 withdrawal. The text of the withdrawal 
notice is not technical or complex and speaks for itself; a later interpretation 
of that text is persuasive only to the extent it is correct. See Skidmore v. 
Swift & Co., 323 U.S. 134, 140 (1944) (giving weight to an agency’s 
“rulings, interpretations and opinions” depending “upon the thoroughness evident 
in [their] consideration, the validity of [their] reasoning, [their] consistency 
with earlier and later pronouncements, and all those factors which give [them] 
power to persuade, if lacking power to control”); cf. Wyeth, 129 S. Ct. 
at 1201 (giving “some weight” to an agency’s views on the impact of tort law on 
federal objectives when the subject matter is technical and the relevant history 
complex). We will not overturn a jury’s verdict on such tenuous 
grounds.
            
All of NHTSA’s later statements, from letters to notices of public 
meetings to reports and action plans, demonstrate the agency’s increased 
willingness to reconsider its 1974 decision to leave motorcoaches essentially unregulated. These events 
culminated in the initiation of rulemaking for the installation of passenger 
seatbelts on motorcoaches. The jury anticipated 
NHTSA’s future actions, and we find no conflict between its verdict and the 
federal safety standards.
            
MCI argues that the history of NHTSA’s motorcoach regulation points in a very different direction. 
It contends that NHTSA chose an alternate method of passenger protection, 
compartmentalization, see supra note 6, and required seatbelts only for 
the driver. Further, MCI asserts that three different cases are more relevant 
than Sprietsma or Myrick: Geier, Carden v. 
Gen. Motors Corp., 509 F.3d 227 (5th Cir. 2007), and BIC Pen Corp. v. 
Carter, 251 S.W.3d 500 (Tex. 2008). In these latter cases, MCI argues, the 
agencies carefully weighed competing interests and chose not to require safety 
devices the plaintiffs wanted. So too here, MCI continues, NHTSA evaluated the 
seating designs and desirability of seatbelts in motorcoaches and purposefully chose a limited scope of 
regulation.
            
We disagree with MCI’s interpretation of NHTSA’s actions. In particular, 
there is nothing in the regulatory history of motorcoaches to suggest that NHTSA intended to rely on 
seating design rather than seatbelts and promulgated standards to that effect. 
As discussed above, the 1973 notice proposed changing seat design to better 
protect passengers and also to incorporate seatbelts as an alternative restraint 
system. In 1974, NHTSA withdrew both proposals, finding that the cost of the 
methods did not justify their benefits. NHTSA did issue seating standards for 
school buses, see 49 C.F.R. § 571.222, but not for motorcoaches. Thus, it is inaccurate to suggest that NHTSA 
chose an alternate method to protect passengers; instead, NHTSA chose not to 
regulate seating design or seatbelts in motorcoaches, 
a decision that does not have preemptive force for the reasons explained 
above.
            
Nor do we find Geier, Carden, or BIC Pen more analogous to the 
present situation. In Geier, the Supreme Court 
considered whether FMVSS 208 preempted a claim that a 1987 vehicle should have 
had airbags. 529 U.S. at 865. FMVSS 
208, as in effect at the time, “deliberately sought variety—a mix of several 
different passive restraint systems.” Id. at 
878. NHTSA also chose to gradually phase in the requirements for passive 
restraints and made them conditional; because seatbelts provided the same or 
greater benefit at a lower cost, the passive-restraint standard would be 
rescinded if two-thirds of the states mandated seatbelt use within a certain 
period of time. Id. at 879–80. The reasons for 
this mix of restraints and gradual phase-in over time reflected NHTSA’s 
experience and considerations of cost and public acceptance. Even though 
seatbelts provided the best protection in the event of a crash, most of the 
public did not wear them at the time. Id. at 
877. While passive restraints such as airbags could provide some of that 
lost protection, they created problems of their own (e.g., harm to children), 
cost more than seatbelts, and were viewed with suspicion by the public. Id. at 877–78. Thus, rather than simply mandate 
airbags—a tactic that had failed when NHTSA required seatbelt buzzers and 
ignition interlocks[18]—NHTSA decided that public “safety would 
best be promoted if manufacturers installed alternative protection 
systems in their fleets rather than one particular system in every car.” Id. at 881 (quotation marks omitted). Because the 
plaintiffs’ suit required a single standard mandating the installation of 
airbags, it “presented an obstacle to the variety and mix of devices that the 
federal regulation sought.” Id. Because the suit required all of the 
manufacturer’s cars sold in the District of Columbia to be equipped with 
airbags, when FMVSS 208 only required ten percent of the manufacturer’s 
nationwide fleet to be so equipped, it “stood as an obstacle to the gradual 
passive restraint phase-in that the federal regulation deliberately imposed.” 
Id. Accordingly, the rule of law advocated by the plaintiffs was 
preempted by federal law. Id.
            
In Carden, the Fifth Circuit considered 
whether FMVSS 208 preempted the plaintiffs’ claim that a car manufacturer should 
have installed a lap/shoulder seatbelt rather than a lap belt alone in the rear 
center seat of a 1999 Pontiac Grand Am. 509 F.3d at 229. Finding Geier directly on point, the court reviewed 
the history of FMVSS 208 and concluded that NHTSA deliberately gave 
manufacturers the choice of which kind of seatbelt to install based on specific 
policy reasons. Id. at 230–31. These reasons 
included the technical difficulties associated with installing a shoulder belt 
in the rear center position, and the greater cost of doing so even when the 
expected safety benefit was minimal given the low occupancy rate in that seat. 
Id. at 231. The Fifth Circuit then 
distinguished Sprietsma and its analysis of 
non-regulation by noting the presence of explicit regulation and the choice 
given therein. Id. at 232.
            
Finally, in BIC Pen, this Court considered whether federal law 
preempted a design defect claim regarding a BIC lighter. 251 
S.W.3d at 503. We reviewed the certification process lighters must 
undergo at the direction of the Consumer Product Safety Commission, the 
regulatory agency charged with developing safety standards for consumer 
products. Id. The Commission adopted regulations that require lighters to 
successfully resist operation by eighty-five percent of a child-test panel. 
Id. This number was chosen based on numerous factors, “including child 
resistence, overall safety, the realities of 
manufacturing, the variability and randomness of child testing, the product’s 
utility, and the importance of customer acceptance.” Id. at 507 (citing 
16 C.F.R. § 1210.5(c)). The Commission was particularly concerned that lighters 
not be too difficult to operate or adults would forgo 
their use and resort to non-child-resistant lighters or matches, which posed 
even greater dangers to children. Id. Because the Commission weighed 
these factors and struck a delicate balance between them, we concluded that 
“imposing a common law rule that would impose liability above the federal 
standard is contrary to the Commission’s plan and conflicts with federal law.” 
Id. Accordingly, we held that the design defect claim was preempted. 
Id. at 509.
            
MCI argues these cases illustrate the preemptive effect of an agency’s 
regulatory action following a careful analysis of various, and often competing, 
considerations of safety and cost. But MCI misses a telling distinction between 
these cases and the present one. In Geier, 
Carden, and BIC Pen, the agencies 
actually issued regulations. These regulations balanced competing 
considerations, as MCI notes, but in each case the courts considered the 
preemptive effect of a regulation. When an agency issues regulations, a 
federal law exists with which a state law can conflict. But when the agency 
chooses not to regulate, there is no preemptive federal law absent a clear and 
manifest indication of the agency’s intent to forbid all regulation. NHTSA has 
not taken that further step regarding passenger seatbelts in motorcoaches. In this respect, the present case is more akin 
to Sprietsma and Myrick, in which 
the Supreme Court found no preemptive intent in the agencies’ 
non-action.
            
Regulatory silence will not preempt a state law absent a clear and 
manifest statement of intent to forbid all regulation in that area. Applying 
this standard to NHTSA’s decision not to require passenger seatbelts in motorcoaches, we find nothing in the regulatory history or 
agency statements indicative of such intent. In this lacuna of regulation, the 
jury’s finding that MCI should have installed seatbelts on its motorcoach does not conflict with any federal law and is not 
preempted.
            
D. Glazing Materials and Federal Preemption[19]
            
We next consider the effect of FMVSS 205 on the Plaintiffs’ claim that 
the motorcoach should have had laminated-glass 
windows. Unlike the seatbelt claim, here NHTSA issued an actual federal safety 
standard giving manufacturers a choice of glazing materials, including laminated 
and tempered glass. The jury determined that MCI should have used laminated 
glass rather than tempered glass and that this defect caused some of the 
Plaintiffs’ injuries. The parties agree that FMVSS 205 gives a choice but 
disagree on its significance. Thus, we must decide if an agency’s deliberate 
decision to give manufacturers a choice between several different materials, 
none of which is superior to the others in all circumstances, preempts a jury’s 
conclusion that another of the required types should have been used. We conclude 
that it does not.
            
The Safety Act defines the federal motor vehicle safety standards as 
“minimum standard[s].” 49 U.S.C. § 30102(a)(9). 
And state regulation of vehicle safety through common-law tort actions is 
expressly allowed: “[The Safety Act’s saving clause] preserves those actions 
that seek to establish greater safety than the minimum safety achieved by a 
federal regulation intended to provide a floor.” Geier, 529 U.S. at 870; see also 49 U.S.C. § 
30103(e). Of course, a tort action that seeks to impose a requirement forbidden 
by a federal standard, or that forbids what the standard requires, is preempted 
due to the actual conflict. Likewise, a tort action that presents an obstacle to 
the federal purpose is preempted—Geier 
is clear that ordinary preemption principles apply. 529 
U.S. at 874. But we must be mindful that Congress generally intended the 
federal safety standards to set a minimum standard for performance and allowed 
juries to determine in particular cases if the vehicle manufacturer should have 
done more.
            
The text of FMVSS 205 states its three-fold purpose—to reduce injuries 
resulting from impact to glazing surfaces, to provide driver visibility, and to 
minimize ejections—and incorporates by reference the standards of ANSI/SAE 
Z26.1-1996. 49 C.F.R. § 571.205, S2, S3.2(a). The ANSI 
standard delineates the testing requirements for the various glazing materials 
and allows the use of either laminated glass or tempered glass in vehicle 
windows other than the windshield, which must have laminated glass. See 
ANSI/SAE Z26.1-1996, T.1 (Items 1 & 2). Nothing in the text of FMVSS 205 
indicates that it is anything other than a minimum materials standard. In the 
absence of the standard, manufacturers could use any material allowed by state 
law; the standard simply limits the range of available choices.
            
MCI argues that the choice of glazing materials is enough to preempt a 
jury’s finding that a different material should have been used. To be clear, the 
jury did not find that MCI should have used a glazing material not permitted by 
FMVSS 205, only that MCI should have used a different glazing material allowed 
by the standard. Even such a finding, MCI contends, violates the purpose of 
FMVSS 205 and the policy-motivated decisions NHTSA made in adopting it. Central 
to MCI’s argument is its interpretation of Geier and that opinion’s analysis of FMVSS 
208. MCI claims that Geier and lower 
courts following it have applied FMVSS 208 to preempt tort actions that sought 
to hold manufacturers liable for not choosing a different safety measure allowed 
by the standard.
            
Lower courts have, in fact, interpreted Geier in this fashion,[2][0] but we believe these courts have read 
Geier too broadly. The Supreme Court in 
Geier did not condemn a common-law rule 
merely because it foreclosed a choice under the relevant safety standard. 
Rather, the Court emphasized the purpose of the choice: “FMVSS 208 embodies the 
Secretary’s policy judgment that safety would best be promoted if manufacturers 
installed alternative protection systems in their fleets rather than one 
particular system in every car.” 529 U.S. at 881 (quotation 
marks omitted). That is, the choice itself furthered the overall 
goal of safety, allowing manufacturers to experiment with different options and 
to build the public’s confidence in the new technologies. The specific reasons 
for this mix of safety options phased-in over time is discussed above, and there 
is no doubt that Geier’s 
choice-with-a-purpose reasoning is securely grounded in FMVSS 208 and its 
particular history. To the extent that other courts have interpreted Geier in the context of FMVSS 208 and NHTSA’s 
decision to phase-in a mix of passive restraint systems, we agree they are 
correct. But when Geier’s reasoning is 
oversimplified to find preemption based on a choice between two safety options 
and then exported to other safety standards where the unique text and history of 
FMVSS 208's passive restraint requirements are not relevant, we must 
respectfully disagree.[21]
            
Given our interpretation of Geier, we 
turn to MCI’s argument that FMVSS 205 represents NHTSA’s deliberate decision to 
give manufacturers a choice of safety options. That is, MCI seems to contend 
that NHTSA made a Geier-like policy decision to 
encourage a range of glazing choices. We do not agree. As noted, FMVSS 205 then 
and now gives manufacturers a choice of materials and recognizes that no one 
type is superior in all circumstances. See 49 C.F.R. § 571.205, S3.2(a); ANSI/SAE Z26.1-1996 § 2.2. In the final rule 
adopting the new ANSI/SAE standards, NHTSA did not state a positive desire to 
preserve the use of tempered glass in windows by forbidding contrary state 
regulation. See 68 Fed. Reg. 43,964. Rather, 
NHTSA declined to continue rulemaking regarding advanced glazing materials after 
completing a ten-year study of the subject because other safety measures, such 
as side air curtains, also helped to mitigate ejections and NHTSA needed to 
devote its resources to developing standards for them. See 67 Fed. Reg. at 41,366. NHTSA also cited the costs associated with 
redesigning vehicles to accept advanced glazing materials and noted that use of 
these materials may increase the risk of neck injuries. Id.
            
In short, NHTSA extensively studied the issue and did not change the 
safety standard, which still allows manufacturers to choose among several types 
of glazing materials. FMVSS 205 is unlike FMVSS 208 and its carefully 
constructed timetable and mix of safety options. Compare 49 Fed. Reg. 6732, and 68 Fed. Reg. 43,964, 
with Occupant Crash Protection Final Rule, 49 Fed. Reg. 28,962 (July 17, 1984) (to be codified at 49 C.F.R. pt. 
571). Neither set of standards is, as MCI argues, a “choice among the 
best available alternatives.” Rather, the former merely narrows the range of 
manufacturers’ choice of glazing materials from potentially unlimited to a short 
list. The latter emphasizes the choice among options as an important and 
integral part of the overall safety scheme. We find nothing in the standard’s 
text, history, or NHTSA’s comments to indicate that FMVSS 205 is anything other 
than a minimum standard. As a minimum standard, FMVSS 205 does not preempt the 
jury’s finding that MCI should have used laminated glass in the motorcoach’s windows.[22]
            
We are not the first court to examine the preemptive effect of FMVSS 205. 
In O’Hara v. General Motors Corp., the Fifth Circuit addressed the same 
issue in the context of a sport utility vehicle. 508 F.3d 753, 
755 (5th Cir. 2007). The plaintiffs claimed that General Motors should 
have used advanced glazing materials in the side windows of a 2004 Chevrolet 
Tahoe instead of tempered glass. Id. The Fifth Circuit considered the 
text and history of FMVSS 205 as well as NHTSA interpretations of the standard 
and general comments on the subject matter of advanced glazing materials. See 
id. at 759–63. It concluded that FMVSS 205 differs 
from FMVSS 208 both in text and purpose—specifically that the relevant “factors” 
of the latter, “detailed implementation timelines, full vehicle testing 
procedures and ‘options’ language,” that supported preemption—were 
“conspicuously absent from FMVSS 205.” Id. at 
760. The court found that NHTSA commentary on FMVSS 205 supported “the 
conclusion that it is a minimum safety standard.” Id. 
at 761. Interestingly, the court also considered NHTSA’s decision to 
terminate rulemaking on advanced glazing materials and analogized that choice to 
the Coast Guard’s non-action in Sprietsma:
We find the parallels between NHTSA’s Withdrawal of 
Rulemaking and the Coast Guard’s statements in Sprietsma to be compelling. NHTSA’s 2002 
Notice of Withdrawal focused on the need to develop experimental standards for 
new rollover accident technologies. It did not reject advanced glazing as unsafe 
(indeed, FMVSS 205 continued to require advanced glazing in vehicle 
windshields). Like the Coast Guard, the NHTSA Notice of Withdrawal cited cost 
concerns and minor safety issues to justify the agency’s change in course. And 
also like the Coast Guard, NHTSA has continued to study advanced glazing as part 
of its rollover protection program. NHTSA’s Notice of Withdrawal “does not 
convey an authoritative message of a federal policy against” advanced glazing in 
side windows.
 
 Id. at 762–63.[23] Finding FMVSS 205 to be a minimum safety 
standard, the court held that the plaintiffs’ negligence and strict liability 
claims were not preempted. Id. at 
763.
            
The Supreme Court of West Virginia also considered whether FMVSS 205 
preempted a claim that a vehicle manufacturer should have used advanced glazing 
materials rather than tempered glass in the side window of a sport utility 
vehicle. Morgan v. Ford Motor Co., 680 S.E.2d 77, 81 
(W. Va. 2009). The court examined Geier, 
O’Hara, and Wyeth at some length, see id. at 88–93, and specifically rejected the interpretation of 
Geier that we adopt, instead holding 
that a regulation giving a choice between different materials preempts a tort 
action premised on the superiority of one option, id. at 94–95. The court reasoned that “because the NHTSA made a 
public policy decision to not mandate advanced glazing in side windows because 
of safety concerns that advanced glazing has a slightly increased risk of neck 
injuries,” it was compelled to find Geier 
directly applicable. Id. at 94.[24]
            
As our analysis makes plain, we agree with O’Hara. The Morgan 
court errs by concluding that merely because NHTSA chose not to require 
something for policy reasons, states may not do so as well. As discussed above, 
the rule in Sprietsma regarding the 
preemptive force of regulatory non-action is not so broad, particularly when 
NHTSA still permits manufacturers to choose what it would not require. There is 
no evidence that NHTSA intended to disallow states from requiring the use of 
advanced glazing materials in side windows. Nor do we agree with the Morgan 
court’s broad interpretation of Geier, that 
preemption is mandated whenever an agency makes a considered decision to 
preserve the status quo and its range of choices. As the Solicitor General has 
said: “Manufacturers always have the ‘option’ of exceeding a minimum safety 
standard when NHTSA has decided not to mandate a more stringent alternative 
because of considerations of cost or feasibility—as NHTSA did in this case and, 
indeed, often does in considering regulatory alternatives. But if such an 
‘option’ alone were enough to trigger federal preemption under Geier, the Safety Act’s savings clause would be 
greatly undermined.” Brief for the United States as Amicus Curiae at 15, 
Williamson v. Mazda Motor of Am., Inc., No. 08-1314. We agree. 
Attributing preemptive intent to every deliberate agency decision runs afoul of 
Congress’s choice to define the safety standards as minimum standards and its 
clear decision to allow juries a place in developing common-law rules that 
exceed the federally defined floor.
            
We hold that FMVSS 205 is a minimum standard that merely limits the 
possible glazing materials a manufacturer may choose for incorporation in its 
vehicles. As such, the jury’s finding that MCI should have used a different 
glazing material in the motorcoach here presents no 
obstacle to the accomplishment and execution of a federal policy. Thus, we hold 
that the jury’s verdict in favor of the Plaintiffs is not preempted by federal 
law.
III. Settling 
Persons
            
We finally consider whether Central Texas and the bus driver[25] are settling persons under Chapter 33 of 
the Texas Civil Practice and Remedies Code. The 1995 version of Chapter 33 
provided a proportionate responsibility framework for apportioning percentages 
of responsibility in the calculation of damages.[26] At that time, 
section 33.003 required a trier of fact to determine 
the percentage of responsibility for each claimant, each defendant, each 
settling person, and each responsible third party who had been properly joined. 
Tex. Civ. Prac. & Rem. 
Code § 33.003.[27] Section 33.013 provided, with some 
exceptions, that a defendant was only liable for the percentage of 
responsibility found by the trier of fact, unless the 
percentage exceeded fifty percent. Id. § 33.013(a);[2][8] F.F.P. Operating Partners, L.P. v. 
Duenez, 237 S.W.3d 680, 687 (Tex. 2007). If a 
defendant’s percentage of liability exceeded fifty percent, the defendant was 
jointly and severally liable for the entirety of the damages recoverable by the 
claimant. Tex. Civ. Prac. & Rem. Code § 33.013(b); 
Duenez, 237 S.W.3d at 
687.
            
Relevant to our determination of this issue is the definition of a 
“settling person.” While “settle” and “settlement” were not defined in Chapter 
33, see C & H Nationwide, Inc. v. Thompson, 903 S.W.2d 315, 319 (Tex. 
1994), “settling person” was. A “settling person” was “a person who at the time 
of submission has paid or promised to pay money or anything of monetary value to 
a claimant at any time in consideration of potential liability . . . with 
respect to the personal injury, property damage, death, or other harm for which 
recovery of damages is sought.” Tex. 
Civ. Prac. & Rem. Code § 33.011(5).[29] Here, the trial court refused MCI’s 
request to include Central Texas as a “settling person” in a proportionate 
responsibility question in the jury charge. Whether the trial court erred in 
this ruling is crucial: a finding by the jury that Central Texas had a 
percentage of responsibility as a settling person could potentially have reduced 
MCI’s percentage of liability to fifty percent or less, thus limiting the amount 
of damages MCI would have had to pay.
            
Our analysis of whether Central Texas is a settling person under Chapter 
33 turns on a question of statutory construction. A question of statutory 
construction is a legal one which we review de novo, “ascertaining and giving 
effect to the Legislature’s intent as expressed by the plain and common meaning 
of the statute’s words.” Duenez, 237 S.W.3d at 
683 (citing Tex. Dep’t of Transp. v. City of Sunset Valley, 146 S.W.3d 
637, 642 (Tex. 2004)); see also Leland v. Brandal, 257 S.W.3d 204, 206 (Tex. 2008) (citing 
Nat’l Liab. & Fire Ins. Co. v. Allen, 15 
S.W.3d 525, 527 (Tex. 2000)) (observing the necessity of a court determining and 
giving effect to the Legislature’s intent in construing a statute).[30] We first look at “the statute’s 
language to determine that intent, as we consider it ‘a fair assumption that the 
Legislature tries to say what it means, and therefore the words it chooses 
should be the surest guide to legislative intent.’” Brandal, 257 S.W.3d at 207 (quoting Fitzgerald v. 
Advanced Spine Fixation Sys., Inc., 996 S.W.2d 864, 866 (Tex. 1999)). Thus, 
we consider the statute’s plain and common meaning, and do not “look to 
extraneous matters for an intent the statute does not state.” Allen, 
15 S.W.3d at 527.
            
As noted, the applicable version of Chapter 33 defined “settling person” 
as a person who, at the time of submission, has paid or promised to pay 
anything of value to a claimant in consideration of liability. C & 
H Nationwide, 903 S.W.2d at 320. We apply the plain 
meaning of these words to the facts before us. Here, Central Texas had filed for 
bankruptcy, but its insurer deposited, on the bankruptcy court’s order, the 
limits of its policy into the court’s registry for payment to the Plaintiffs. 
Central Texas also agreed to pay the claimants $7,000 a year for five years. 
There is no question that the claimants who chose to obtain funds from the 
Apportionment Plan “settled” with Central Texas—they received money in exchange 
for a release of Central Texas’s liability. But the Plaintiffs chose to 
participate in the Litigation Plan, which they claim could not constitute a 
settlement due to its uncertain and adversarial nature at the time of submission 
in the trial court.
            
As the court of appeals observed, all the parties in the bankruptcy court 
engaged in extensive negotiations over the division of the funds among the 
litigants, and Central Texas and its insurer did not oppose tendering the funds 
into the court’s registry or participating in mediation. Thus, Central Texas 
definitely paid something of monetary value to the claimants, including the 
Plaintiffs—$5 million in insurance proceeds, plus $7,000 annually—in respect to 
its potential liability, and the Plaintiffs negotiated for, and were the 
ultimate recipients of, some of these proceeds. Central Texas was further 
discharged from tort liability in the bankruptcy court on approval of its 
reorganization plan, which the Plaintiffs approved. Although the Litigation Plan 
was arguably not styled a settlement by the claimants or bankruptcy court, it 
had all semblances of a settlement. See Ratcliff v. Fibreboard Corp., 819 F. Supp. 584, 588–89 (W.D. Tex. 
1992) (concluding that agreement was a final settlement under Chapter 33, 
despite language in the agreement to the contrary). We hold, under these facts, 
that Central Texas is a settling person, and the trial court should have 
submitted a question to the jury concerning Central Texas’s proportionate 
responsibility as such.
            
The Plaintiffs advance several arguments supporting their position that 
Central Texas cannot be considered a settling person under the applicable 
version of Chapter 33. We address each in turn. First, the Plaintiffs contend 
that the uncertain and adversarial nature of the Litigation Plan renders the 
Plan a form of litigation. One group of claimants—those who elected to 
participate in the Apportionment Plan—did immediately collect their proportion 
of the insurance funds, while those who elected to participate in the Litigation 
Plan deferred their receipt of the funds. Our inquiry, then, is whether electing 
to defer the collection of funds permits the Plaintiffs to deny Central Texas’s 
status as a settling person. We conclude it does not. The definition of settling 
person requires only a promise to pay, not an actual payment, in consideration 
for a release from liability. See C & H Nationwide, 903 S.W.2d at 320. Here, there was, in essence, a promise to 
pay in consideration for Central Texas’s release from liability. While the 
Plaintiffs chose to present arguments in a hearing before a special judge, the 
Litigation Plan also allowed the Plaintiffs to “agree at any time to approve 
full or partial distribution of the Litigation Funds to any or all 
participants,” even without going before the special judge. There was never a 
real possibility that the Plaintiffs would not recover some amount of proceeds 
from the Litigation Fund: the Plaintiffs not only had the option of receiving 
the proceeds in the Litigation Fund at any time, but the Litigation Plan 
contained no provision for the return of any nonawarded proceeds to Central Texas or its 
insurer.
            
Further, even though the Plaintiffs chose not to approve distribution 
from the Litigation Fund before the hearing in front of the special judge, the 
hearing was not adversarial in nature and the end result of the hearing was 
certain before it began. Central Texas was not present at the hearing and, of 
course, had no reason to be present since it had irrevocably paid money into the 
court’s registry in exchange for a release from liability. Thus, the hearing 
lacked the adversarial nature the Plaintiffs contend existed. The Plaintiffs 
argue that the amount each claimant might have received following the hearing 
was uncertain. But the Litigation Plan capped the amount of each claimant’s 
recovery at 110% of that determined by the mediator, and each participant in the 
Litigation Plan received within two percent of the amount determined by the 
mediator, with one exception. Even if the exact amount each claimant might have 
received was uncertain, there was little uncertainty that each Plaintiff was 
going to receive some amount. The statute does not require certainty in 
the actual amount of the money or thing of monetary value—just the promise that 
the person will receive something of value. Tex. Civ. Prac. & Rem. Code § 
33.011(5);[3][1] see also Gilcrease v. Garlock, Inc., 
211 S.W.3d 448, 455 (Tex. App.—El Paso 2006, no pet.) (holding settlement agreement was not contingent because the 
defendants made an unconditional promise to pay).
            
Second, the Plaintiffs contend that Central Texas’s release from 
liability in the bankruptcy court was involuntary under federal bankruptcy law, 
and thus cannot constitute a settlement. See In re Arrowmill Dev. Corp., 211 B.R. 497, 
503 (Bankr. D.N.J. 
1997). But to hold that the definition of “settling person” requires a 
voluntary release of claims would compel us to insert language into the statute 
that is not there. See Fortis Benefits v. Cantu, 234 S.W.3d 642, 649 n.41 
(Tex. 2007) (noting that courts “should not by judicial fiat insert non-existent 
language into statutes”). In any event, it is inaccurate to describe Central 
Texas’s release from liability as involuntary. Central Texas and its insurer 
engaged in negotiations concerning not only the money to be placed in the 
bankruptcy court’s registry and the manner in which funds were to be allocated, 
but also whether or not Central Texas was to be released from liability. When 
the Plaintiffs voted in favor of approving Central Texas’s reorganization plan, 
they consented to release Central Texas from liability.
            
Third, the Plaintiffs contend that there was uncertainty “at the time 
of submission.” Tex. Civ. Prac. 
& Rem. Code § 33.011(5) (requiring the payment or promise to pay 
something of monetary value to have occurred “at the time of submission” in 
order for a person to be considered a “settling person”) (emphasis 
added).[32] But the fact that the Plaintiffs had not 
actually presented their cases to the special judge at the time of submission 
does not change whether or not the settlement was certain. At the time of 
submission in the trial court, Central Texas and its insurer had already 
deposited funds in the bankruptcy court’s registry, the Litigation Plan had been 
in place for over two years, and the Plaintiffs had the option of requesting 
disbursement of their proportionate shares of the Fund.
            
Fourth, the Plaintiffs argue that the proper vehicle for proportioning 
some share of Central Texas’s potential liability would have been through its 
joinder as a responsible third party. Under the 
applicable version of Chapter 33, a responsible third party was defined as a 
person (1) over whom the court can exercise jurisdiction, (2) who was not sued 
by the claimant, and (3) who is or may be liable for all or part of the damages 
claimed against the named defendant. Tex. Civ. Prac. & Rem. Code § 
33.011(6).[33] The term specifically excluded “a person 
or entity that is a debtor in bankruptcy proceedings or a person or entity 
against whom this claimant’s claim has been discharged in bankruptcy, except to 
the extent that liability insurance or other source of third party funding may 
be available to pay claims asserted against the debtor.” Id. The 
Plaintiffs contend that since a debtor in bankruptcy without the 
availability of liability insurance was excluded from the definition of 
responsible third party, it follows that a debtor in bankruptcy with the 
availability of liability insurance—like Central Texas—is a responsible third 
party.[34] Assuming that Central Texas could 
properly be characterized as a responsible third party, nothing in Chapter 33 
suggested that a party’s identification as a responsible third party or settling 
person is an either-or proposition. A person could potentially fall within the 
definitions of both settling person and responsible third party, and the 
Legislature included no language in Chapter 33 indicating otherwise. See 
Brandal, 257 S.W.3d at 206 (noting that the 
Legislature “tries to say what it means, and therefore the words it chooses 
should be the surest guide to legislative intent” (citing Fitzgerald, 996 
S.W.2d at 866)); Lee v. City of Houston, 807 S.W.2d 290, 295 (Tex. 1991) 
(observing that a court may not “judicially amend a statute and add words that 
are not implicitly contained in the language of the statute”). The Legislature 
did not limit the designations of settling person and responsible third party as 
exclusive, and we will not read such a limitation into the statute. See C 
& H Nationwide, 903 S.W.2d at 320 (concluding that the definition of 
“settling person” is not limited to those who fully resolve all claims against 
them and includes those who settle only partially); City of Rockwall v. 
Hughes, 246 S.W.3d 621, 629 (Tex. 2008) (noting that a statute is to be 
interpreted as written, unless the context requires otherwise or the 
construction would lead to an absurd result).
            
Fifth, the Plaintiffs contend that to find Central Texas a settling 
person will confuse settlement jurisprudence and overbroadly designate a person as settling any time the 
person deposits funds in a court’s registry. We disagree with this assertion. We 
do not hold that a deposit of funds in a court’s registry is always akin to a 
settlement. Rather, it is so when, as here, the negotiations and terms of an 
agreement in every way resemble a settlement. When this is the case, we must 
define it as what it is—a settlement. As discussed 
before, Central Texas and its insurer did not simply deposit funds in the 
bankruptcy court’s registry. They negotiated the terms of the deposits with the 
claimants and entered into a mediated agreement where the claimants could either 
accept the funds immediately or defer acceptance to a later date, and Central 
Texas was released from liability. Our holding will also have no adverse effect 
on parties in bankruptcy proceedings or in settlement negotiations. To the 
contrary, parties in bankruptcy and related litigation will know that if they 
enter into an agreement that in all respects resembles a settlement, they will 
be deemed settling persons in related state litigation for purposes of Chapter 
33.
            
Finally, the Plaintiffs point to statements made both in documents in the 
bankruptcy court[35] and by the bankruptcy court judge 
suggesting that the Litigation Plan was not a settlement under Chapter 33. In 
his dissent, Chief Justice 
Jefferson also relies on these statements as indication that the 
Litigation Plan was not a settlement. But these statements were not part of the 
bankruptcy court’s holdings. As the court of appeals observed, these were merely 
ipse dixit statements that, in any event, have no bearing on our 
interpretation of Texas law. See Allen, 15 S.W.3d at 527 (observing that 
we consider the statute’s plain and common meaning and do not “look to 
extraneous matters for an intent the statute does not state”); cf. In re 
W.E.R., 669 S.W.2d 716, 716 (Tex. 1984) (per curiam) (holding that appellate court may not accept a trial 
judge’s oral comments as findings of fact or conclusions of law).
            
Chief Justice Jefferson 
asserts that we improperly construe the circumstances under which the Plaintiffs 
pursued their claims in the bankruptcy court. We respectfully disagree. As 
discussed above, the portion of the Apportionment Plan concerning the Litigation 
Plan specifically provided that the Litigation Plan participants could agree 
at any time to distribution of Litigation Funds to any or all 
participants, provided that it was done in writing by all participants in the 
Litigation Plan. Although the Plaintiffs did not ultimately exercise this 
option, it was available to them at the time of submission in the trial court. 
Thus, at the time of submission, not only had Central Texas unilaterally 
deposited funds in the bankruptcy court registry for future distribution to the 
claimants, but the Plaintiffs—and other Litigation Plan participants—had the 
option of receiving those funds at any time. Moreover, even though the 
Plaintiffs ultimately decided to pursue the “litigation” option, the record 
belies a description of the hearing before the special judge as adversarial or 
contingent. The claimants crafted the Litigation Plan after extensive 
negotiations and, as previously mentioned, could not individually recover more 
than 110% of the mediator’s allocation. While it is true that the Litigation 
Plan did not set a floor on each claimant’s possible individual recovery, there 
was never a real possibility that any of the Plaintiffs—all victims of the bus 
accident and their families—would receive none of the bankruptcy court funds, 
given that the hearing was uncontested and the Litigation Plan contained no 
provision for the return of undisbursed funds to Central Texas. This is not a 
retroactive view of the proceedings: because Central Texas’s reorganization plan 
had previously been approved, Central Texas had no reason to appear at the 
hearing. Of course, the dissent correctly notes that the actual results of the 
hearing before the special judge are not relevant since we must determine 
settlement “at the time of submission.” But the results—with all but one 
participant receiving within two percent of the amount assigned by the 
mediator—do highlight the fact that this was not actual, adversarial litigation with an uncertain outcome. 
There is further no indication in the record that other “potential parties” were 
entitled to the Litigation Funds in lieu of the Litigation Plan participants. 
Rather, the bankruptcy judge stated that other parties might be entitled to 
those funds if the Litigation Plan participants were not for whatever reason. At 
the time of submission, Central Texas had deposited the limits of its insurance 
policy in the bankruptcy registry and had been released from liability, and the 
Litigation Plan participants had the option of either receiving their 
proportionate shares of the funds or bringing their cases before a special judge 
in a nonadversarial hearing. Despite how the 
bankruptcy court or the Plaintiffs might describe these events, we conclude they 
constitute a settlement under Chapter 33.
            
Chapter 33 expresses the Legislature’s intent to hold defendants 
responsible for only their own conduct. Its purpose is to hold each person 
“responsible for [the person’s] own conduct causing injury.” Duenez, 237 S.W.3d at 690. 
“This is consistent with a fundamental tenet of tort law that an entity’s 
liability arises from its own injury-causing conduct.” Id. We therefore 
hold that the trial court erred in refusing to submit a question to the jury 
concerning Central Texas’s proportionate responsibility as a settling 
person.
IV. 
Conclusion
            
For the foregoing reasons, we affirm the court of appeals’ judgment and 
remand the case to the trial court for further proceedings consistent with this 
opinion.
 
                                                                                    
_______________________________
                                                                                    
Eva M. Guzman
                                                                                    
Justice
 
OPINION DELIVERED: December 17, 
2010






[1] Motorcoach, intercity bus, and bus are used interchangeably 
in this opinion, but are distinguished from transit buses. See Notice of 
Public Meeting on Motorcoach Safety Improvements, 67 
Fed. Reg. 14,903 (Mar. 28, 2002).

[2] To be 
clear, the bus crash victims who submitted claims in the bankruptcy proceeding 
are a larger group than the Plaintiffs here. Some of these claimants opted for 
compensation under the Apportionment Plan, leaving about half of the insurance 
proceeds for distribution to those who chose to participate in the Litigation 
Plan.

[3] One 
participant received less than the amount assigned by the mediator in line with 
the jury findings in the trial court.

[4] Justice 
Thomas has gone so far as to question whether implied obstacle preemption can be 
reconciled with the Supremacy Clause’s mandate that only federal law can preempt 
state law: “Congressional and agency musings, however, do not satisfy the Art. 
I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt 
state law under the Supremacy Clause.” Wyeth, 129 S. 
Ct. at 1207 (Thomas, J., concurring in the judgment). Instead, Justice 
Thomas contends, “[p]re-emption must turn on whether state law conflicts with 
the text of the relevant federal statute or with the federal regulations 
authorized by that text.” Id. at 1208. However, 
the United States Supreme Court continues to uphold and apply obstacle 
preemption based on federal purpose, and we are bound to follow.

[5] For 
buses manufactured between January 1, 1972 and September 1, 1990, manufacturers 
actually had a choice even for the driver position. § 571.208, S4.4.1. They 
could design a “complete passenger protection system”—applicable only to the 
driver—that fulfilled certain crash requirements, id. S4.4.1.1, or they 
could install a seatbelt at the driver’s position, id. S4.4.1.2. For 
buses weighing more than 10,000 pounds, like the bus here, manufacturers still 
have that choice, although the seatbelt option is more stringent. See id. 
S4.4.3.1. Since 1991, buses weighing less than 10,000 pounds are required to 
have seatbelts both for passengers and for the driver. Id. 
S4.4.3.2.

[6] NHTSA 
did issue a new safety standard applicable only to school buses. See 49 
C.F.R. § 571.222. The standard required a system of compartmentalization, 
which uses engineered seating arrangements to protect passengers during a crash. 
In 1983, NHTSA denied a petition for rulemaking that sought to require seatbelts 
in school buses. See Denial of Petition for Rulemaking, 48 Fed. Reg. 
47,032 (Oct. 17, 1983).

[7] MCI 
asks the Court to take judicial notice of a 1977 study performed by the Indiana 
University at Bloomington Institute for Research in Public Safety. See 
Stansifer et al., Inst. for Research 
in Pub. Safety, Analysis for Need for Passenger Safety 
Belt Requirements in Intercity Buses 
(1977). The study was commissioned by the Federal Highway 
Administration, an agency within the Department of Transportation, and addressed 
the desirability of seatbelts in intercity buses. The report concluded that, 
among other things, the usage rate of seatbelts during the study period 
(1972–1976) was quite low and did not recommend a seatbelt requirement. While 
the report viewed seatbelts as desirable, it noted that the cost of installation 
could not be justified unless 80% of passengers properly wore the belts, while 
current rates of voluntary usage were then less than 20%.
                
    While the report meets the requirements for judicial 
notice, see Tex. R. Evid. 
201; Office of Pub. Util. 
Counsel v. Pub. Util. Comm’n, 878 S.W.2d 
598, 600 (Tex. 1994) (per curiam) (“To be the proper 
subject of judicial notice, a fact must be capable of accurate and ready 
determination by resort to sources whose accuracy cannot reasonably be 
questioned. Judicial notice is mandatory if requested by a party and [the court 
is] supplied with the necessary information.” (quotation marks and citation 
omitted; alteration in original)), and we therefore take judicial notice of it, 
we fail to see the relevance of the report to NHTSA’s regulatory function. NHTSA 
did not commission the report, and it did not change any federal safety standard 
in response to the report. Because only federal law can preempt contrary 
state law—which, in that context, is the domain of NHTSA through its rule-making 
process—this report does not affect our analysis of the preemption issues. 
See Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d 237, 243 (3d Cir. 2008) 
(“[W]e must reiterate, lest the analysis become unmoored, that it is federal 
law which preempts contrary state law; nothing short of federal law can 
have that effect.”). Even if NHTSA was aware of the report, NHTSA’s non-action 
in response cannot reasonably be interpreted as more than preserving the status 
quo, which at that time meant no seatbelt requirement in motorcoaches like the one at issue here. NHTSA’s inaction 
regarding this report cannot be interpreted as expressing a policy forbidding 
seatbelts, or even as a deliberate decision not to require seatbelts.

[8] Hinton 
asks this Court to take judicial notice of both the report and the NPRM. MCI 
does not oppose either request, and we agree the standards of judicial notice 
are met. See supra note 7. Accordingly, we grant Hinton’s request and 
take judicial notice of both the report and the NPRM.

[9] The 
ANSI/SAE standard in effect in 1995 was the American National Standard “Safety 
Code for Safety Glazing Materials for Glazing Motor Vehicles Operating on Land 
Highways” Z-26.1-1977, January 26, 1977, as supplemented by Z26.1a, July 3, 
1980. See Glazing Materials Final Rule, 49 Fed. Reg. 
6732, 6734 (Feb. 23, 1984) (formerly codified at 49 C.F.R. pt. 571). 
NHTSA adopted the 1996 version in 2003 to increase safety, to harmonize with 
foreign glazing standards, and to streamline and clarify the standard. See 
Glazing Materials Final Rule, 68 Fed. Reg. 43,964, 43,965 
(July 25, 2003) (to be codified at 49 C.F.R. pt. 571). The difference 
between the older and newer versions is immaterial to this appeal given that 
both permitted laminated and tempered glass.

[10] 
Laminated glass means two or more pieces of sheet, plate, or float glass 
bonded together by an intervening layer or layers of plastic material. It will 
crack or breach under sufficient impact, but the pieces of glass tend to adhere 
to the plastic. If a hole is produced, the edges are likely to be less jagged 
than would be the case with ordinary annealed glass. ANSI/SAE 
Z26.1-1996 § 1.6. Tempered glass means a single piece of specially 
treated sheet, plate, or flat glass possessing mechanical strength substantially 
higher than annealed glass. When broken an any point, 
the entire piece breaks into small pieces that have relatively dull edges as 
compared to those of broken pieces of annealed glass. Id. § 1.21.

[11] The 
1987 version of the preemption clause read:
 
Whenever a 
Federal motor vehicle safety standard established under this subchapter is in 
effect, no State or political subdivision of a State shall have any authority 
either to establish, or to continue in effect, with respect to any motor vehicle 
or item of motor vehicle equipment any safety standard applicable to the same 
aspect of performance of such vehicle or item of equipment which is not 
identical to the Federal standard.
 
Former 15 U.S.C. § 1392(d) (1988) (current version at 49 U.S.C. § 
30103(b)).

[12] The 
1987 version of the saving clause read: “Compliance with any Federal motor 
vehicle safety standard issued under this subchapter does not exempt any person 
from any liability under common law.” Former 15 U.S.C. 1397(k) 
(1988) (current version at 49 U.S.C. § 30103(e)).

[13] 
See, e.g., Erwin Chemerinsky, 
Empowering States When It Matters: A Different 
Approach to Preemption, 69 Brook. L. 
Rev. 1313, 1319 (2004) (“The only way to make sense of [Geier] is to see it as putting a presumption in favor 
of preemption.”); Susan Raeker-Jordan, A Study in 
Judicial Sleight of Hand: Did Geier v. American 
Honda Motor Co. Eradicate the Presumption Against Preemption?, 17 BYU 
J. Pub. L. 1, 2 (2002) (“The 
five-member majority [in Geier] accomplished 
its apparent goal of preemption in the case by abandoning the long-standing 
presumption against preemption and the concomitant requirement that Congress’s 
intent to preempt be clear, and it thereby removed any protections the 
presumption provided to federalism principles, state tort law, and Congress’s 
own preemptive intentions.” (footnotes 
omitted)).

[14]
We have 
applied the presumption against preemption since Geier, even when considering the preemptive effect of 
the Safety Act and the safety standards promulgated thereunder. See Great Dane Trailers, 52 S.W.3d at 
743; see also Graber v. Fuqua, 279 S.W.3d 608, 611–12 (Tex. 2009) 
(applying the presumption when deciding if the federal bankruptcy regime 
preempted a state malicious prosecution claim).

[15] NHTSA 
had promulgated a safety standard requiring trucks using air brakes to stop 
within certain distances. See Myrick, 514 U.S. at 284 
(citing Air Brake Systems; Trucks, Buses, and Trailers, 36 Fed. Reg. 3817 (Feb. 27, 1971) (to be codified at 49 C.F.R. pt. 
571)). Manufacturers notified NHTSA that the distances could not be 
achieved without using ABS devices and that these devices were unreliable. Id. at 285. When NHTSA disagreed, the manufacturers 
brought suit and succeeded in having the standard suspended until NHTSA compiled 
sufficient evidence that ABS devices did not create a greater danger. Id. 
As of the Supreme Court’s writing, the standard was still suspended. Id. at 285–86.

[16] To the 
extent it is relevant at all, the 1977 study 
commissioned by the Federal Highway Administration corroborates this conclusion. 
See supra note 7. The report gives no indication that NHTSA affirmatively 
opposed any state law requiring seatbelts in motorcoaches. To be sure, seatbelts are not, according to 
the study, an unmitigated benefit to the passengers. The kind of accident, such 
as a side collision, could well neutralize the seatbelts’ protection.

[17] We 
recognize that several other courts have reached the opposite conclusion. See 
Lake v. Memphis Landsmen, L.L.C., No. W2009-00526-COA-R3-CV, 2010 WL 891867, 
at *9–*11 (Tenn. Ct. App. Mar. 15, 2010); Doomes v. Best Transit Corp., 890 N.Y.S.2d 
526, 526 (N.Y. App. Div. Dec. 10, 2009); Surles v. Greyhound Lines, Inc., No. 
4:01-CV-00107, 2005 WL 1703153, at *5–*6 (E.D. Tenn. July 20, 2005). We are not 
persuaded by these opinions, particularly as to their reliance on the 1992 
letter from NHTSA’s chief counsel. We further note that while Congress may have 
intended to create uniform standards for the motor vehicle industry, it also 
allowed—via the saving clause—juries to hold manufacturers liable for inadequate 
safety measures. See Wyeth, 129 S. Ct. at 1200 (“The case for federal 
pre-emption is particularly weak where Congress has indicated its awareness of 
the operation of state law in a field of federal interest, and has nonetheless 
decided to stand by both concepts and to tolerate whatever tension there [is] 
between them.” (quoting Bonito Boats, Inc. v. 
Thunder Craft Boats, Inc., 489 U.S. 141, 166–67 (1989) (alteration in 
original)).

[18] An 
ignition interlock “force[s] occupants to buckle up by 
preventing the ignition otherwise from turning on.” Id. 
at 876. Public displeasure at these methods resulted in Congress 
passing a law disallowing DOT from requiring them. Id.

[19] The 
jury found that the lack of seatbelts caused the injuries of all the Plaintiffs. 
Thus, our conclusion that the seatbelt claim is not preempted is sufficient to 
uphold the jury’s verdict. Even so, we discuss the preemptive effect of FMVSS 
205 because, in light of the remand for a new trial, the issue of glazing 
materials will feature prominently on retrial. Accordingly, we address it to 
provide guidance to the trial court. See Edinburg Hosp. Auth. v. Trevino, 
941 S.W.2d 76, 81 (Tex. 1997) (“Although resolution of this issue is not 
essential to our disposition of this case, we address it to provide the trial 
court with guidance in the retrial . . . .”).

[20] 
See, e.g., Carden, 509 F.3d at 
230–31 (“Geier, thus, compels the conclusion 
that a state tort suit that would foreclose a safety option intentionally left 
to vehicle manufacturers by Federal Motor Vehicle Safety Standards is 
preempted.”); Griffith v. Gen. Motors Corp., 303 F.3d 1276, 1282 (11th 
Cir. 2002) (“[U]nder Geier, when a Federal Motor Vehicle Safety Standard 
leaves a manufacturer with a choice of safety device options, a state suit that 
depends on foreclosing one or more of those options is preempted.”); Hurley 
v. Motor Coach Indus., Inc., 222 F.3d 377, 383 (7th Cir. 2000) 
(“[W]hen a Federal Motor Vehicle Safety Standard leaves a manufacturer with a 
choice of safety device options, a state suit that depends on foreclosing one or 
more of those options is preempted.”); Carrasquilla v. Mazda Motor Corp., 166 F. 
Supp. 2d 169, 176 (M.D. Pa. 2001) (concluding that plaintiffs’ claim was 
“attacking one of the specifically permitted passive restraint options [under 
FMVSS 208]” (alteration in original)); Hernandez-Gomez v. Volkswagen of Am., 
Inc., 32 P.3d 424, 428–29 (Ariz. Ct. App. 2001) (concluding that plaintiff’s 
state tort claim is preempted by FMVSS 208); Williamson v. Mazda Motor Co. of 
Am., Inc., 84 Cal. Rptr. 3d 545, 556 (Cal. Ct. 
App. 2008) (concluding that plaintiffs’ claim related to lap-only seatbelt is 
barred by FMVSS 208), cert. granted, 77 U.S.L.W. 3611 (U.S. May 24, 2010) 
(No. 08-1314); Roland v. Gen. Motors Corp., 881 N.E.2d 722, 728–29 (Ind. 
Ct. App. 2008) (holding that plaintiffs’ common-law tort action is preempted “on 
the narrow grounds” that it conflicts with FMVSS 208, but refusing to join other 
courts that find preemption on “broader grounds” when any regulation affords a 
choice to manufacturers); Osman v. Ford 
Motor Co., 833 N.E.2d 1011, 1021 (Ind. Ct. App. 2005) (holding that claims 
asserted in connection with automobile’s passive-restraint system were preempted 
by FMVSS 208); Heinricher v. Volvo Car 
Corp., 809 N.E.2d 1094, 1097–98 (Mass. App. Ct. 2004) (concluding that 
plaintiffs’ state common law claims are preempted by FMVSS 208); Morgan 
v. Ford Motor Co., 680 S.E.2d 77, 94–95 (W. Va. 2009) (“We therefore find 
that because the NHTSA gave manufacturers the option to choose to install either 
tempered glass or laminated glass in side windows of vehicles in FMVSS 205, 
permitting the plaintiff to proceed with a state tort action would foreclose 
that choice and would interfere with federal policy.”). But see O’Hara v. 
Gen. Motors Corp., 508 F.3d 753, 759 (5th Cir. 2007) (“When a federal safety 
standard deliberately leaves manufacturers with a choice among designated design 
options in order to further a federal policy, a common law rule which 
would force manufacturers to adopt a particular design option is preempted.” 
(emphasis added)).

[21] Hinton 
asks this Court to take judicial notice of the Solicitor General’s amicus brief 
filed in Williamson v. Mazda Motor of America, Inc., No. 08-1314, pending 
before the United States Supreme Court. We grant Hinton’s request. See 
supra note 7. In Williamson, the Court granted certiorari to consider 
whether FMVSS 208 preempts a claim that a 1993 Mazda MPV van should have been 
equipped with a lap/shoulder belt in the rear middle seat rather than a lap-only 
belt. See 130 S. Ct. 3348 (May 24, 2010) (order granting certiorari); 
see also Brief for the United States as Amicus Curiae at 5, 21, 
Williamson v. Mazda Motor of Am., Inc., No. 08-1314 (U.S. Apr. 23, 2010). 
The Solicitor General, joined by DOT and NHTSA, rejected the broad reading of 
Geier: “The government’s briefs to this Court 
have consistently explained that NHTSA’s decision to allow options, standing alone, does not compel a finding of 
preemption.” Brief for the United States as Amicus Curiae at 18, Williamson 
v. Mazda Motor of Am., Inc., No. 08-1314. Instead, more is needed: “But 
without more (such as the emphasis on diversity of solutions discussed in Geier), the States are not foreclosed from 
concluding, through a duty of care applied in common-law tort actions, that one 
option is superior to the others.” Id. at 
19.

[22] On 
this issue, we agree with the Fifth Circuit in O’Hara, discussed below, 
that the presumption against preemption is unnecessary for resolution of the 
glazing materials claim because the jury’s verdict does not actually conflict 
with FMVSS 205. See 508 F.3d at 759 
n.4.

[23] We do 
not understand MCI to argue that because NHTSA chose not to change the glazing 
options in FMVSS 205 after ten years of study, we should interpret this 
non-action as an affirmative policy decision against advanced glazing materials 
in side windows. Even if it had, we find persuasive O’Hara’s comparison 
to Sprietsma.

[24] The 
Tennessee Court of Appeals followed Morgan’s analysis when 
confronted with the issue. See Lake, 2010 WL 891867, at *6–*9. The 
Lake court identified the split between O’Hara and Morgan 
and agreed with the latter. The South Carolina Supreme Court also followed 
Morgan’s and Lake’s analysis on this issue. Priester v. Cromer, 697 S.E.2d 567, 571 (S.C. 2010).

[25] Unless 
otherwise specified, we will refer to Central Texas and the bus driver 
collectively as “Central Texas” in this section of the opinion.

[26] The 
1995 version of Chapter 33 applies to this case because the Plaintiffs filed 
suit on June 26, 2003. Chapter 33 was amended on June 2, 2003, but those 
amendments apply only to a cause of action filed on or after July 1, 2003. See Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 4.05, 23.02(c), 2003 Tex. Gen. Laws 847, 856–57, 
899.

[27] Act of 
June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, 1987 
Tex. Gen. Laws 37, 41, amended by Act of May 8, 1995, 74th Leg., R.S., 
ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972, amended 
by Act of June 2, 2003, 78th Leg., R.S., ch. 204, 
§ 4.02, 2003 Tex. Gen. Laws 847, 855 (current version at Tex. Civ. Prac. & Rem. 
Code § 
33.003).

[28] Act of 
May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. 
Gen. Laws 3242, 3271, amended by Act of June 3, 1987, 70th Leg., 1st 
C.S., ch. 2, § 2.09, 1987 Tex. Gen. Laws 37, 42, 
amended by Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 974, amended by 
Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 
4.07, 4.10(5), 2003 Tex. Gen. Laws 847, 858–59 (current version at Tex. Civ. Prac. & Rem. 
Code § 
33.013).

[29] Act of 
June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.07, 1987 
Tex. Gen. Laws 37, 41, amended by Act of May 8, 1995, 74th Leg., R.S., 
ch. 136, § 1, 1995 Tex. Gen. Laws 971, 973, amended 
by Act of June 2, 2003, 78th Leg., R.S., ch. 204, 
§ 4.05, 2003 Tex. Gen. Laws 847, 856–57 (current version at Tex. Civ. Prac. & Rem. 
Code § 
33.011(5)).

[30] The 
court of appeals stated that the appropriate standard of review for the 
“settling person” inquiry is abuse of discretion. While it is true that we 
generally review a trial court’s refusal to submit a particular instruction 
under an abuse of discretion standard, see In re V.L.K., 24 S.W.3d 338, 
341 (Tex. 2000), an issue of statutory construction is a legal question which we 
review de novo. See Duenez, 237 S.W.3d at 638; 
see also Galle v. Pool, 262 S.W.3d 564, 571 n.3 (Tex. App.—Austin 2008, 
pet. denied).

[31] Act of 
June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.07, 1987 
Tex. Gen. Laws 37, 41, amended by Act of May 8, 1995, 74th Leg., R.S., 
ch. 136, § 1, 1995 Tex. Gen. Laws 971, 973, amended 
by Act of June 2, 2003, 78th Leg., R.S., ch. 204, 
§ 4.05, 2003 Tex. Gen. Laws 847, 856–57 (current version at Tex. Civ. Prac. & Rem. 
Code § 
33.011(5)).

[32] Act of 
June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.07, 1987 
Tex. Gen. Laws 37, 41, amended by Act of May 8, 1995, 74th Leg., R.S., 
ch. 136, § 1, 1995 Tex. Gen. Laws 971, 973, amended 
by Act of June 2, 2003, 78th Leg., R.S., ch. 204, 
§ 4.05, 2003 Tex. Gen. Laws 847, 856–57 (current version at Tex. Civ. Prac. & Rem. 
Code § 33.011(5)). The 
current version of section 33.011(5) allows for the settlement to occur “at any 
time.” Tex. Civ. Prac. & Rem. Code § 
33.011(5). The applicable version of the statute, however, 
was limited to settlements made “at the time of submission.”

[33] Act of 
May 8, 1995, 74th Leg, R.S., ch. 136, § 1, 1995 Tex. 
Gen. Laws 971, 973, amended by Act of June 2, 2003, 78th Leg., R.S., 
ch. 204, § 4.05, 2003 Tex. Gen. Laws 847, 856–57 
(current version at Tex. Civ. Prac. 
& Rem. Code § 
33.011(6)).

[34] MCI 
did attempt to join Central Texas as a responsible third party, but the trial 
court refused this request. MCI appealed this decision to the court of appeals, 
which held that the trial court did not abuse its discretion in denying MCI’s 
motion for leave to join Central Texas as a responsible third party. MCI did not 
brief this issue to this Court; accordingly, we express no opinion on the 
propriety of the trial court’s refusal to submit a responsible third party 
question to the jury.

[35] For 
example, the bankruptcy court order approving and describing the Apportionment 
Plan states that participation of a bus crash claimant in the Litigation Plan 
“shall not constitute a settlement.” As the Plaintiffs note in their brief, the 
claimants prepared and agreed to the Apportionment Plan.